Richard M. RAGSDALE, M.D., et al., Plaintiffs,

v.

Bernard J. TURNOCK, et al., Defendants.

No. 85 C 6011.

United States District Court, N.D. Illinois, E.D.

Nov. 27, 1985.

**14. Injunction ⌾138.75**

Alan Gilbert, Susan M. Kornfield, Sonnenschein, Carlin, Nath & Rosenthal, Colleen K. Connell, Roger Baldwin Foundation of ACLU, Inc., Chicago, Ill., for plaintiffs.

Randolph T. Kemmer, Asst. State's Atty., Chicago, Ill., for Richard M. Daley.

Kathleen T. Kreisel, Gladys M. Stevens, Asst. Attys. Gen., Chicago, Ill., for other defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Plaintiffs bring this action against defendants pursuant to 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. §§ 2201, 2202, seeking declaratory and injunctive relief. Plaintiffs challenge the constitutionality of three Illinois statutes, and the regulations thereunder, which, plaintiffs contend, form a scheme that in effect requires all abortions to be performed in a hospital or its functional equivalent. Plaintiffs charge that this scheme violates the equal protection rights of Illinois physicians who perform or desire to perform abortions, and the privacy rights of Illinois women who desire or may desire to obtain an abortion.

This matter is now before the court on the motions of plaintiffs to certify two plaintiff classes and one defendant class, and for a preliminary injunction against defendants. The plaintiffs have moved the court to maintain the following classes: (1) a plaintiff class of "all duly licensed physicians and surgeons performing or desiring to perform pregnancy terminations in Illinois," represented by named plaintiff, Dr. Richard M. Ragsdale; (2) a plaintiff class

of "all women in the state of Illinois of child-bearing age who desire or may desire an abortion sometime in the future," represented by named plaintiffs Sarah Roe and Margaret Moe; and (3) a defendant class of "the State's Attorneys for all of the counties of the state of Illinois," represented by named defendant, Richard M. Daley. The plaintiffs have also moved the court to enjoin defendants from enforcing, in derogation of a physician's right to perform, and a woman's right to obtain, first and early second trimester abortions, three Illinois statutes: (1) Section 16(1) of the Illinois Medical Practice Act ("MPA"), Ill.Rev. Stat. ch. 111, para. 4433(1); (2) the Ambulatory Surgical Treatment Center Act of Illinois ("ASTCA"), Ill.Rev.Stat. ch. 111½, para. 157–8.1—157–8.16, and the regulations promulgated thereunder; and (3) the Illinois Health Facilities Planning Act ("HFPA"), Ill.Rev.Stat. ch. 111½, para. 1151–1168, and the regulations promulgated thereunder.

The court has reviewed the pleadings of the parties dealing with the class certification motion. The court held a hearing on the motion for preliminary injunction on November 18–22 and 26, 1985. The court has reviewed the pleadings dealing with the preliminary injunction motion, and has heard the opening statements and closing arguments of counsel and the testimony of witnesses. The court has considered all the evidence presented, including the depositions of several witnesses who did not testify at the hearing. The court has drawn reasonable inferences from this evidence, and has evaluated the legal arguments presented by the parties. In judging the credibility of each witness and the weight to be given the testimony of each, the court has taken into account for each witness the intelligence, ability and opportunity to observe, the age, the memory, the manner while testifying, any interest, bias, or prejudice the witness may have, and the reasonableness of the testimony considered in the light of all the evidence in the case. The court has reviewed its extensive hearing notes and its references concerning credibility.

Based on all of the evidence and legal arguments presented, and for the reasons set forth below, the court grants, with some modification, plaintiffs' motion for certification of the three classes, and the court grants plaintiffs' motion for a preliminary injunction. A preliminary consideration of the challenged statutes and regulations, and of the facts, will greatly aid in the discussion of both motions. Therefore, the court now turns to the statutes and regulations, and to the facts.

## I. The Challenged Statutes and Regulations

The statutes and regulations which plaintiffs challenge in this action present an unusual mixture of abortion-specific and general provisions.[1] First, section 16 of the MPA generally provides the grounds upon which the IDPH may revoke or suspend the medical license of any person. However, subsection (1), the only portion of section 16 which plaintiffs challenge, is abortion-specific. Under subsection (1), the

---

1. The challenged statutes are not part of the explicitly separate Illinois "Abortion Laws," Ill. Rev.Stat. ch. 38, para. 81–21 to 81–35, 81–51 to 81–55, 81–61 to 81–70, the constitutionality of which has been challenged on several occasions. *See, e.g., Zbaraz v. Hartigan,* 763 F.2d 1532 (7th Cir.1985); *Charles v. Carey,* 627 F.2d 772 (7th Cir.1980), *appeal after remand sub nom. Charles v. Daley,* 749 F.2d 452 (7th Cir.1984), *probable jurisdiction noted sub nom. Diamond v. Charles,* —— U.S. ——, 105 S.Ct. 2356, 86 L.Ed.2d 257 (1985); *Wynn v. Carey,* 599 F.2d 193 (7th Cir. 1979); *Wynn v. Carey,* 582 F.2d 1375 (7th Cir. 1978).

Likewise, there have been previous challenges to the constitutionality of the statutes involved in this case. In *Village of Oak Lawn v. Marcowitz,* 86 Ill.2d 406, 55 Ill.Dec. 916, 427 N.E.2d 36 (1981), the Illinois Supreme Court struck down a portion of a village ordinance, on equal protection and privacy grounds, which incorporated the ASTCA's definition of an Ambulatory Surgical Treatment Center ("ASTC"). Also, in *Bickham v. Lashof,* No. 76 C 4564, slip op. (N.D.Ill. Jan. 28, 1981), the court denied defendants' motion to dismiss the allegations in plaintiff's complaint that the ASTCA and MPA are unconstitutional. However, this case, which dealt with some of the exact issues presented here, was apparently dismissed for want of prosecution without a decision on the merits.

IDPH may revoke or suspend the license of any physician who performs an "elective abortion" in any place other than an ASTC, a hospital, or a facility run by the state, the federal government, or a state university or college. Essentially, section 16(1) prohibits physicians from performing even one abortion in their offices, and requires physicians who wish to provide abortion services in non-hospital environments to comply with the ASTCA and the HFPA.

The ASTCA defines what an ASTC is and provides for the licensure of all ASTCs. Section 3 of the ASTCA defines an ASTC as "any institution, place or building devoted primarily to the maintenance and operation of facilities for the performance of surgical procedures or any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose." Thus, the ASTCA applies generally to all ASTCs devoted primarily to the performance of surgical procedures, regardless of the specific procedure performed, while at the same time the ASTCA singles out, for more strict regulation, facilities at which abortions are performed. The remainder of the ASTCA concerns, for the most part, the requirements and the procedure for obtaining an ASTC license. One other provision of the ASTCA deals specifically with abortion, and that is section 6.1, which requires any corporation operating an ASTC devoted primarily to providing facilities for abortion to have a physician, who is licensed to practice medicine in all of its branches and is actively engaged in the practice of medicine at the ASTC, on the ASTC's board of directors as a condition to licensure of the ASTC.

The regulations promulgated pursuant to the ASTCA are comprehensive and detailed. They cover all aspects of the provision of abortion services, from personnel policies to physical plant requirements. Many of the regulations are abortion-spe-

cific. An entire section of the regulations, Subpart G, is abortion-specific. The regulations in subpart G include a prohibition upon the performance of abortions after the first trimester and reporting requirements for each abortion performed in an ASTC.

The physical plant requirements in the regulations cover building design, construction standards, physical requirements and mechanical and electrical systems. In effect, they require ASTCs to be the functional equivalent of small hospitals.[2] These regulations include, but are not limited to, the following:

(a) Regulation 205.1320(a), requires an ASTC to be "identifiably separate" from other [medical] facilities and functions.

(b) Regulation 205.1330, requires anyone seeking to build or substantially remodel an ASTC to submit work plans to the state for prior approval. These work plans include architectural drawings, structural drawings, and mechanical drawings (which include drawings of the heating, cooling, ventilation, plumbing, drainage, standpipe and electrical systems).

(c) Regulation 205.1360(a), requires that an examination room be at least 80 square feet in size.

(d) Regulation 205.1360(b), requires that a procedure room have a minimum clear area of 250 square feet.

(e) Regulation 205.1370(a), requires an ambulatory surgical treatment center to have a "control station" located to permit "visual surveillance of all traffic which enters the operating suite".

(f) Regulation 205.1370(k), requires that "staff and personnel facilities be provided for male and female personnel," including a lounge, lockers, separate toilets, and space for changing clothes.

---

**2.** Mr. Triemari, a Consulting Engineer and an expert in plumbing, heating and air conditioning, testified at the injunction hearing that the ASTC physical plant regulations are comparable, or generally equivalent, to those in the Illinois Hospital Licensing Act, Ill.Rev.Stat. ch. 111½, para. 142, *et seq.*, and the Chicago Hospital Ordinance. He also testified that many of the requirements, such as those dealing with air flow, are not required of physicians' offices.

(g) Regulation 205.1370(n), requires a separate janitorial closet exclusively for the surgical suite.

(h) Section 205.1380, requires an ambulatory surgical treatment center to establish a "diagnostic facility" equipped to perform diagnostic tests far more elaborate and complex than those performed during the course of a pregnancy termination.

(i) Regulation 205.1400 regulates the size of doors and halls to require that some corridors be at least 8 feet in width and that doors to procedure rooms be at least 3 feet 8 inches wide. These dimensions parallel the requirements for hospital corridors.

(j) Section 205.1540 regulates the air conditioning, heating, and ventilation systems to require (a) specific filter efficiencies and (b) air flow systems "balanced" to comply with the detailed ventilation and pressure relationships established by the regulation. Different pressure relationships and air change requirements are specified for the following areas: (1) the procedure room, (2) the examination area, (3) the recovery room, (4) the instrument cleaning room, (5) the toilet room, (6) the janitors' closet, (7) the linen and trash area, (8) the anesthesia storage area, (9) the equipment storage area, (10) the clean linen and storage area, (11) the soiled linen storage area, (12) the laboratory area, and (13) miscellaneous other areas.

As can be seen, these regulations are extremely detailed. The regulations, without question, cause abortion providers to incur great construction or renovation costs.

The HFPA requires all "health Care facilities," which includes all ASTCs, to obtain a "permit," or certificate of need, be-

fore acquiring major medical equipment or constructing or modifying a health care facility. HFPA §§ 3, 5. The procedure which the HFPA established for acquiring a certificate of need is as follows: (1) the applicant must submit a comprehensive application to the Illinois Health Facilities Planning Board ("Board"), HFPA § 6; (2) if there is an Areawide Health Planning Organization, the Board forwards the application to this organization for a period of review which may last up to 120 days, HFPA § 8; (3) the Areawide Health Planning Organization, or the IDPH, must provide an opportunity for a public hearing on the application, and may schedule that hearing up to 90 days after the receipt of a complete application, HFPA § 8; and (4) ultimately, the Board will determine whether to grant or deny the application for a certificate of need based on factors such as the applicant's ability to provide a proper standard of health care service for the community, the economic feasibility of the project, and the project's consistency with the public interest and the orderly and economic development of such facilities, HFPA § 6.[3]

## II. The Facts

The uncontroverted facts are as follows. Dr. Ragsdale is a licensed Illinois physician. He is the Director of the Northern Illinois Women's Center ("NIWC"), which is located in Rockford, Illinois. The NIWC provides gynecological, family planning and abortion services to women in northwest Illinois.

Since it opened in 1973, the NIWC has been the only provider of abortion services in the large area of northwest Illinois. This geographic area extends east to Chicago, west to Iowa, north to Wisconsin, and south to Peoria. The NIWC offers first trimester and early second trimester "Dilation and Evacuation" abortions, all per-

**3.** Raymond Passeri, the Chief of the Division of Facilities Development at the IDPH and the Executive Secretary of the Board, testified at the hearing that the HFPA was enacted in part because of the concern that allowing an unlimited number of health care facilities to be constructed would not fill a "need," but would instead waste the Illinois taxpayers' money because of the cost-plus disbursement arrangement. This arrangement is no longer in effect, and, certainly, abortion facilities do not utilize public funds for construction or renovation; therefore, the certificate of need procedure seems particularly inappropriate as applied to abortion facilities.

formed with a local anesthetic. The NIWC provides either reduced fee or free abortion services to indigent women. In 1984, physicians at the NIWC performed 3,480 abortions. Few complications resulted.[4]

The NIWC is currently licensed under the ASTC, and has been so since 1973, although at no time has the NIWC fully complied with the ASTCA and its regulations.[5] The current location of the NIWC is the Rockford Medical Arts Building, which is operated by the Rockford Services Company.

In early February, 1985, the Rockford Services Company informed Dr. Ragsdale that his lease would not be renewed. The fundamental reason the Rockford Services Company did not renew Dr. Ragsdale's lease, as set out in the telephonic deposition of Mr. Delts, the President of the Rockford Services Company, is that the premises of the NIWC are needed as office space for physicians that refer more patients to the adjoining Rockford Memorial Hospital. Deposition of William Delts, p. 15. Another factor in the decision, however, was the determination that it would cost approximately $240,000 for the building to be brought into compliance with the ASTCA and its regulations. *Id.* at 8, 9, 14.

Since the Rockford Services Company informed him that his lease would not be renewed, Dr. Ragsdale has attempted to find new facilities and secure a certificate of need for such facilities. Dr. Ragsdale, for reasons set forth below in detail, has not been able to secure a relocation site for the NIWC. On December 31, 1985, the NIWC must vacate its premises in the Rockford Medical Arts Building. At that

time, because of a lack of a relocation site, the NIWC will be forced to close altogether.

Margaret Moe is a registered nurse, and she currently operates two medical facilities, one in Elgin, Illinois, and another in Palatine, Illinois. The Elgin facility is in Kane County, and the Palatine facility is in Cook County. Margaret Moe's facilities offer complete family planning education and medical care, including the prescription of contraceptives, pre-natal care and delivery-assistance for pregnant women.

Margaret Moe receives approximately 60 requests for abortions per week at her clinics. She would like to offer abortion services at her facilities, and the licensed physicians she employs are competently trained and willing to perform safe abortions. However, Margaret Moe's facilities do not comply with the physical plant, structural and administrative requirements of the ASTCA and its regulations. As set forth more fully below, Margaret Moe has not, and cannot, renovate her existing facilities or construct new facilities that would comply with the ASTCA and its regulations because of the prohibitive cost of such a project.

The two other named plaintiffs are Sarah Roe and Jane Doe. Sarah Roe is a female citizen of the United States, of child-bearing age and a resident of Rockford, Illinois. She is the mother of two children. Ms. Roe had an abortion at the Northern Illinois Women's Center for which she was charged only a minimal fee because of her current indigent financial situation. She may need another abortion in the future. Jane Doe is a female citizen of the United

4. Dr. Ragsdale presented the NIWC's complication statistics at the hearing. According to Dr. Ragsdale, approximately 9 women per 40,000 require immediate hospitalization after having an abortion at the NIWC, no deaths have resulted from abortions at the NIWC, and 10 to 15 women per 40,000 develop complications within a few days after an abortion at the NIWC, such as a fever from infection. These extremely low complication rates attest to Dr. Ragsdale's skill and experience as an abortion provider. Both Margaret Moe, an expert in the area of women's health care and family planning, and Dr. Hern,

an expert on abortion practice, testified at the hearing that, in their opinion, Dr. Ragsdale is an extremely skilled and careful abortion provider. Indeed, even Dr. Barton, the defendants' expert on obstetrics and gynecology, testified that he has "some certainty" that the hospital in which he works, Illinois Masonic Medical Center, has referred patients to Dr. Ragsdale for abortions.

5. There are currently 44 ASTCs in Illinois. Approximately half of these provide abortion services.

States and of child-bearing age. She is a resident of Rockford, married and the mother of several children. From other doctors in the Rockford area, Ms. Doe learned that uterine fibroids associated with a recent pregnancy posed a serious risk to her health; she was told that it was unlikely she would be able to carry her pregnancy past five months. Despite the severe pain and emotional trauma associated with this health threat, Ms. Doe was refused abortion services by several doctors in Rockford. Finally she was referred to Dr. Ragsdale at the NIWC from whom Ms. Doe received an abortion.

### III. Motion For Class Certification

As stated above, plaintiffs have moved the court to maintain the following classes: (1) a plaintiff class of "all duly licensed physicians and surgeons performing or desiring to perform pregnancy terminations in Illinois," represented by named plaintiff, Dr. Ragsdale; (2) a plaintiff class of "all women in the state of Illinois of child-bearing age who desire or may desire an abortion sometime in the future," represented by named plaintiffs, Margaret Moe and Sarah Roe; and (3) a defendant class of "the State's Attorneys for all of the counties of the State of Illinois," represented by named defendant, Richard M. Daley. Defendants Bernard J. Turnock, Director of the Illinois Department of Public Health ("IDPH"), Neil F. Hartigan, Attorney General of Illinois, and Gary L. Clayton, Director of the Illinois Department of Registration and Education ("IDRE"), through their counsel, have opposed the certification of the plaintiff classes. In addition, defendant Richard M. Daley, through his attorney, has objected to being named as the representative of the defendant class of Illinois State's Attorneys.

Rule 23 of the Federal Rules of Civil Procedure governs the certification of classes in federal courts. In order for a class to be certified, it must meet the four criteria set out in 23(a) and must also qualify under any one of the subsections of 23(b). The four criteria of 23(a) are that (1) the class is so numerous as to make joinder impracticable; (2) there are common questions of law or fact; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Subsection (b) provides that a class action may be maintained if the prosecution of separate actions would create certain risks, the party opposing the class has acted on grounds generally applicable to the class, making injunctive and declaratory relief appropriate, or the court finds that the questions of law or fact common to the members of the class predominate and that a class action is the superior method for adjudication of the controversy. The burden of establishing these class requirements rests on plaintiffs. *Eggleston v. Chicago Journeymen Plumbers Local Union No. 130*, 657 F.2d 890, 895 (7th Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). The court now considers whether the proposed classes meet the class action requirements of Rule 23.

### A. The Plaintiff Class of Physicians

This proposed class consists of all duly licensed physicians and surgeons performing or desiring to perform pregnancy terminations in Illinois, and the proposed representative of this class is Dr. Ragsdale. The court finds that the requirements of Rule 23 are met as to this class and its representative, Dr. Ragsdale.

First, this proposed class of plaintiffs is so numerous that it would be impracticable to individually join all of its members. Although plaintiffs did not present direct evidence of the number of class members, plaintiffs did state that there are approximately 65,860 abortions performed in Illinois annually. Plaintiffs' Motion to Maintain Class Actions, p. 3. In addition, during the hearing on the motion for preliminary injunction, plaintiff Margaret Moe stated that the physicians she employs in her two Illinois health care clinics desire to perform abortions, and that she knew of physicians in Cook, Kane and DuPage counties who would also perform

abortions, but for the challenged statutes and regulations.[6] This evidence amounts to more than mere speculation or conclusory allegations as to the numerousity of the class. *See Valentino v. Howlett,* 528 F.2d 975, 978 (7th Cir.1976). Also, although an exact number of class members has not been determined, due to the difficulty in making such a determination, this does not preclude class certification. *Vergara v. Hampton,* 581 F.2d 1281, 1284 (7th Cir. 1978), *cert. denied,* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979). The court finds that plaintiffs have presented sufficient evidence of the numerousity of this class of physicians.

■ Second, there are questions of law or fact common to the members of this proposed class. Not all factual or legal questions raised in a lawsuit need be common, so long as a single issue of law or fact is common to all class members. *Thillens, Inc. v. Community Currency Exchange Assoc. of Illinois,* 97 F.R.D. 668, 677 (N.D.Ill.1983). Also, variance in class members' positions on the common issue should not be dispositive of the decision to certify the class action. *Id.* Here, all Illinois physicians who perform, or desire to perform, abortions are subject to the challenged statutes and regulations. The question of law common to all physicians in this class is whether the statutes and regulations unconstitutionally impede the equal protection right of physicians in this class to practice their profession.

Third, Dr. Ragsdale's claims are typical of the claims of the class. As a licensed Illinois physician who performs abortions in the course of his regular medical practice, Dr. Ragsdale is subject to the challenged statutes and regulations in the same manner as all other Illinois physicians performing, or desiring to perform, abortions.[7]

■ Fourth, Dr. Ragsdale will fairly and adequately protect the interests of the class. The test of adequacy of representation is two-pronged: (1) the representative must be able to conduct the litigation; and (2) the representative's interests must not be antagonistic to those of the class members. *Thillens,* 97 F.R.D. at 679. Dr. Ragsdale has clearly demonstrated his ability to conduct the litigation in the preliminary injunction proceedings. Furthermore, his attorneys have considerable experience in civil rights litigation. Also, Dr. Ragsdale does not have interests antagonistic to the interests of the class.

Finally, this proposed class meets the requirements of 23(b)(2), as the defendants, in either promulgating, administering or enforcing the challenged statutes and regulations, have acted on grounds generally applicable to the class, making injunctive and declaratory relief appropriate. Here, plaintiffs seek only injunctive and declaratory relief.[8] Finding this class meets the

---

**6.** In the preliminary injunction hearing, defendant Richard M. Daley, through his attorney, did point out on cross examination of Margaret Moe that Margaret Moe had personally worked with physicians in only Cook and Kane Counties.

**7.** Defendants contend in their Response to the Motion for Class Certification that Dr. Ragsdale's claims are not typical of those of the proposed class because the NIWC has been a licensed ASTC since 1973; therefore, "Dr. Ragsdale is challenging the constitutionality of the statutes and regulations through which he has benefitted for more than ten years." Defendants' Response, p. 3. The court finds this argument without merit. Defendants do not articulate what "benefit" Dr. Ragsdale receives under the challenged statutes and regulations. Neither do defendants recognize that other members of the proposed class may also have operat-

ed licensed ASTCs for a number of years. It is axiomatic that those to whom statutes and regulations apply may challenge the constitutionality of such statutes and regulations despite a period of compliance. *See, e.g., Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141, 1146 (7th Cir.1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). Indeed, under the standing requirements of Article III of the United States Constitution, as interpreted by the courts, parties against whom statutes and regulations directly operate may be the "best" plaintiffs for a constitutional challenge, given their concrete personal stake in the outcome of the litigation.

**8.** Defendants contend that the declaratory and injunctive relief plaintiffs request can be granted to all class members without certifying a class; therefore, plaintiffs' motion should be denied. In the Seventh Circuit, however, if a

requirements of Rule 23, the court therefore certifies this plaintiff class and finds Dr. Ragsdale to be an adequate representative.

### B. The Plaintiff Class of Women

■■■ This proposed class consists of all women in Illinois of child-bearing age who desire or may desire an abortion sometime in the future, and the proposed representatives are Margaret Moe and Sarah Roe. The court finds that the requirements of Rule 23 are met as to this class; however, the court appoints, as the named representatives of this class, Margaret Moe and Dr. Ragsdale. The defendants contend that Sarah Roe does not have standing to assert her own privacy rights, let alone the privacy rights of the proposed class members. Such contention need not detain the court at this time, and the court does not decide here whether Sarah Roe does have standing, for it is clear that Margaret Moe and Dr. Ragsdale have standing to litigate this lawsuit on behalf of themselves as well as on behalf of the proposed class of Illinois women. *See, e.g., Westchester Women's Health Organization v. Whalen,* 475 F.Supp. 734, 737 (S.D.N.Y.1979). The court now turns to the requirements of Rule 23.

As stated previously, approximately 65,-860 abortions are performed in Illinois annually. Clearly, the proposed class is so numerous as to make joinder impracticable. Also, as noted before, the difficulty in determining the exact number of class members does not preclude class certification.

There is a question of law common to all members of the proposed class. The common question of law is whether the challenged statutes and regulations unconstitutionally burden the right to privacy of the class members.

As for the typicality of the claims of Dr. Ragsdale and Margaret Moe, and the adequacy of their representation, the court finds that both of these named plaintiffs clearly have standing to assert the claims of Illinois women who desire, or may desire, to obtain an abortion. In *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141, 1145–1148 (7th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975), the Seventh Circuit held that the both the physician and the corporate plaintiff had standing to assert that the abortion regulations unduly infringed upon the privacy rights of their patients. In so holding, the court relied on *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), as making it clear that physicians threatened with criminal liability for the performance of an "illegal" abortion do have a sufficient interest to challenge the validity of a State's abortion law.

In the present case, Dr. Ragsdale and Margaret Moe are not threatened with criminal prosecution, and Margaret Moe is not a physician. However, as owners and operators of medical centers, both are threatened, under the ASTCA and the HFPA, with liability for a "business offense," punishable by a fine of $10,000.00 for each "violation." Each day may constitute a separate violation. ASTCA § 12, HFPA § 14. In addition, under the ASTCA, the IDPH may deny, suspend or revoke an ASTC license and may even "immediately" close a facility under certain conditions, and, under the HFPA, the Illinois Health Facilities Planning Board may deny an application for a permit needed for the acquisition of major medical equipment or the construction or modification of a health care facility. ASTCA §§ 7, 9a, HFPA § 10.[9] Also, Dr. Ragsdale is threat-

---

class meets the prerequisites of Rule 23, a court may not deny class certification on the ground of lack of "need." *Brown v. Scott,* 602 F.2d 791, 795 (7th Cir.1979), *aff'd sub nom. Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Vergara,* 581 F.2d at 1284.

**9.** In *Friendship,* the challenged regulations empowered the city to deny authorization to those

seeking to operate abortion facilities and to order the closing of a facility not in compliance with its regulations. According to the Seventh Circuit, "Surely, those subject to such deprivations through the use of governmental power have a sufficient interest to maintain this type of action. [citations omitted]" *Friendship,* 505 F.2d at 1146.

ened, under the MPA, with the revocation of his medical license. MPA § 16(1). Clearly, both Margaret Moe and Dr. Ragsdale have an extremely concrete interest in the outcome of this litigation, and both therefore have standing to assert the interests of their patients in this action. *See Birth Control Centers, Inc. v. Reizen*, 508 F.Supp. 1366, 1369 (E.D.Mich.1981) (holding that corporate and physician plaintiffs have standing to assert the claims of their patients), *aff'd in part, vac. in part*, 743 F.2d 352 (6th Cir.1984).

■ As the named plaintiffs have standing to assert the claims of this proposed class of women, the court finds that the requirements of typicality and adequacy of representation have been met.[10] The court finds that the named plaintiffs are adequate representatives despite the fact that they are not technically members of the proposed plaintiff class. *See Undergraduate Student Association v. Peltason*, 359 F.Supp. 320, 323 (N.D.Ill.1973) ("As to [the organization's] representation of its members, it would be absurd to hold that an organization has standing in the constitutional sense, but is barred by the technical requirements of Rule 23, Fed.R.Civ.P. [citations omitted].") In fact, these representatives seems particularly appropriate in light of the fact that persons remain in this class for only a short period of time.

As the above discussion establishes, this proposed plaintiff class meets the requirements of section (a) of Rule 23. The proposed class also meets the requirements of Rule 23(b)(2), for the same reasons as discussed with regard to the plaintiff class of physicians. The court therefore certifies this plaintiff class of Illinois women of child-bearing age who desire, or may desire, to obtain an abortion, and finds Margaret Moe and Dr. Ragsdale to be adequate representatives of the class.

### C. The Defendant Class of State's Attorneys

This defendant class consists of the State's Attorneys for all of the 102 counties in the State of Illinois. The named representative is Richard M. Daley, State's Attorney for Cook County, Illinois.

Rule 23 unquestionably authorizes the certification of defendant classes. Section 23(a) provides, in part:

One or more members of a class may sue *or be sued* as representative parties on behalf of all only if ... (3) the claims *or defenses* of the representative parties are typical of the claims *or defenses* of the class ... [emphasis added].

Fed.R.Civ.P. 23(a)(3). In addition, Section 23(b) provides that a class action may be maintained if the requisites of Section 23(a) are met, and "the prosecution of separate actions by *or against* individual members of the class" would create certain risks (emphasis added). *See Thillens*, 97 F.R.D. at 673.

Indeed, in other similar cases in which the plaintiffs have questioned the constitutionality of various sections of the Illinois abortion laws, the courts have certified defendant classes of State's Attorneys, with the State's Attorney of Cook County as the named representative. *Zbaraz v. Hartigan*, 584 F.Supp. 1452, 1454 (N.D.Ill.1984), *modified on other grounds*, 763 F.2d 1532 (7th Cir.1985) (challenging the Parental Notice Abortion Act and designating *Richard M. Daley* as the representative of all the State's Attorneys of all the counties in Illinois); *Wynn v. Scott*, 449 F.Supp. 1302, 1306 (N.D.Ill.1978), *aff'd sub nom., Wynn v. Carey*, 599 F.2d 193 (7th Cir.1979) (challenging certain sections of the Abortion Act of 1975); *Wynn v. Scott*, 448 F.Supp. 997, 1000 (N.D.Ill.1978), *aff'd sub nom., Wynn v. Carey*, 582 F.2d 1375 (7th Cir. 1978) (challenging the Illinois Abortion Parental Consent Act of 1977). However,

---

10. Based on the preliminary injunction proceedings, it is clear that Dr. Ragsdale and Margaret Moe will adequately represent the interests of this proposed plaintiff class. In both the pleadings and the hearing on the preliminary injunc-

tion motion, the named plaintiffs, through their attorneys, focused almost exclusively on the alleged unconstitutional burden that these statutes and regulations place on the right of Illinois women to decide whether to obtain an abortion.

there is no indication that the State's Attorney of Cook County, Illinois objected to representing the class of all Illinois State's Attorneys in these cases.

In the present case, Richard M. Daley does object to being named as the representative of a defendant class of Illinois State's Attorneys. In his answer to the plaintiffs' complaint, Mr. Daley "denie[d] that he should be a class representative" and stated that (1) the class of State's Attorneys of all 102 counties in Illinois is not so numerous that joinder of all members is impracticable; (2) it is incorrect to assume that each State's Attorney in Illinois would assert the same defense to the plaintiff's claims; and (3) he, through his assistants, generally depends on the Illinois Attorney General for the defense in cases challenging Illinois abortion laws. Defendant Daley's Answer, pp. 2, 3. Mr. Daley, through his attorney, repeated his objection to representative status in a later notice of October 30, 1985 and at the hearing on plaintiffs' motion for preliminary injunction.

In *Thillens*, 97 F.R.D. 668, and in *Research Corp. v. Pfister Associated Growers, Inc.*, 301 F.Supp. 497 (N.D.Ill.1969), *appeal dismissed sub nom.*, *Research Corp. v. Asgrow Seed Co.*, 425 F.2d 1059 (7th Cir.1970), the named defendant likewise objected to representing the defendant class. In both cases, the courts certified the defendant classes and found the named defendants to be adequate representatives. According to the *Research Corp.* court, the defendants' objection to being the named representatives "is hardly enough to overcome the overwhelming evidence of their ability and intention to challenge the plaintiff's assertions" and "this factor of 'desire,' as opposed to ability should not be given more than token weight." *Research Corp.*, 301 F.Supp. at 499. *See also Thillens*, 97 F.R.D. at 679.

The *Thillens* court, however, did discuss the special due process concerns which arise upon a motion for certification of a defendant class.[11] As the court noted, the Supreme Court has balanced the concurrent goals of preserving fundamental fairness to absent members of a defendant class and promoting judicial economy "by holding that due process is satisfied and absent members of a class are bound so long as the interests of the absentees are adequately represented [citations omitted]." *Thillens*, 97 F.R.D. at 674. As seen above, the adequacy of the named representative is not an additional requirement, but a requirement already found in Rule 23. The *Thillens* court, however, demanded that this requirement be "strictly observed" as to defendant classes, because of the special due process concerns. With this in mind, this court now turns to the requirements for class certification found in Rule 23.

There is clearly a "juridical link" between the Illinois State's Attorneys here. Under Ill.Rev. Stat. ch. 14, para. 5, each and every State's Attorney is charged with the duty of prosecuting all civil and criminal actions in which the people of the state or county may be concerned. Also, under section 14 of the HFPA, which deals with violations, the State's Attorneys are specifically charged with the duty of representing the people of Illinois in proceedings under that section. As all State's Attorneys are charged under the same statutes with the duty to take uniform enforcement action with respect to plaintiffs, the court therefore finds that the State's Attorneys are related in a way such that single resolution of the dispute is preferred to a multiplicity of similar actions.

11. The *Thillens* court also discussed the problems inherent in certifying both plaintiff and defendant classes in the same action. *Thillens*, 97 F.R.D. at 675–76. The court noted that courts are often reluctant to certify a defendant class when the action is brought by a plaintiff class because of the concern that each plaintiff member has not been injured by each defendant member. However, according to the court, as it interpreted *In re Gap Stores Securities Litigation*, 79 F.R.D. 283 (N.D.Cal.1978), the requirement that each named plaintiff have a claim against each defendant may be waived where the defendant members are related by a conspiracy or "juridical link." The *Thillens* court went on to define a "juridical link" as "some legal relationship which relates all defendants in a way such that single resolution of the dispute is preferred to a multiplicity of similar actions. [citations omitted]"

▮ First, the court finds that the class of 102 State's Attorneys, who are dispersed through the State of Illinois, is so numerous that it would be impracticable to individually join its members. Second, the court finds that there are questions of law common to the proposed class of defendants. Here, the plaintiffs' claim is that the challenged statutory and regulatory scheme is unconstitutional—that it violates the privacy rights of women desiring to obtain abortions and the equal protection rights of physicians desiring to provide abortion services. The overriding common issue of law, therefore, is the constitutionality of the challenged statutes and regulations.

Third, the court finds that the defenses of Richard M. Daley are typical of the defenses of the class of Illinois State's Attorneys. Obviously, the primary defense of Mr. Daley and of all the State's Attorneys in this case will be that the challenged statutes and regulations are indeed constitutional.[12]

Finally, the court finds Mr. Daley to be an adequate representative of the interests of the class. Mr. Daley, through his staff, has already demonstrated, in the preliminary injunction hearing, his ability to conduct the litigation. Mr. Daley is sued in his official capacity; therefore, no serious question can be raised regarding his ability to carry the expense of the class defense. Furthermore, Mr. Daley and his staff have considerable litigation experience. Also, Mr. Daley is a member of the proposed class, and his interests in the subject matter of the litigation are not antagonistic to the interests of the members of the class of State's Attorneys.

The court therefore finds that this proposed class meets the requirements of section (a) of Rule 23. This class also meets the requirements of section (b)(1) of Rule 23. The prosecution of separate actions against individual members of the defendant class would indeed create a risk of inconsistent or varying adjudications, and plaintiffs would thereby be faced with incompatible standards of conduct. Having found that the requirements of Rule 23 have been met as to this class, the court now certifies this defendant class of Illinois State's Attorneys, represented by named defendant Mr. Daley.

## IV. Motion For Preliminary Injunction

As stated above, plaintiffs have moved the court to preliminarily enjoin defendants from administering and enforcing, in derogation of the equal protection rights of physicians who perform, or desire to perform, abortions and privacy rights of women who desire, or may desire, to obtain an abortion, Section 16(1) of the MPA, the ASTCA and the regulations thereunder, and the HFPA and the regulations thereunder. In ruling on a motion for a preliminary injunction, the court must consider the following factors: (1) whether the plaintiffs have no adequate remedy at law and will suffer irreparable harm if the court does not grant the preliminary injunction; (2) whether the irreparable harm the plaintiffs will suffer outweighs any irreparable harm that may reflect on the defendants if the court issues the injunction; (3) whether the plaintiffs have shown a "better than negligible" likelihood of succeeding on the merits; and (4) whether the injunction will disserve the public interest. *Roland Machinery Co. v. Dresser Indus-*

---

12. Some of the State's Attorneys may contend, as Mr. Daley did in his Answer, that the plaintiffs have not stated a cause of action specifically against them. This "affirmative defense" in Mr. Daley's answer apparently rested on the fact that Dr. Ragsdale's clinic was not in Cook County; therefore, Mr. Daley could not prosecute under the ASTCA or HFPA, and Dr. Ragsdale did not "state a cause of action" against Mr. Daley. Dr. Ragsdale is not the only plaintiff, however. Margaret Moe, another named plaintiff, owns and operates a medical facility in Cook County, and she clearly has stated a cause of action against Mr. Daley.

Given the certification of the two plaintiff classes in this order, it is expected that few, if any, State's Attorneys will be able to raise this defense. Accordingly, the court finds that the possibility that any one State's Attorney will raise this defense does not substantially affect the "typical" nature of the named defendants' defenses. *See Research Corp.,* 301 F.Supp. at 499.

*tries,* 749 F.2d 380, 386–387 (7th Cir.1984). Here, the court finds that all four factors weigh decidedly in favor of issuing a preliminary injunction.

## A. No Adequate Remedy At Law And Irreparable Harm

Plaintiffs in this case have demonstrated that they will indeed experience irreparable harm should the court not issue this injunction. The challenged statutory and regulatory scheme, as written and as enforced, has the effect of raising the cost and limiting the availability of abortions. The scheme forces complying facilities to raise their fees, possibly beyond the economic means of some women, discourages other non-complying facilities from offering abortion services, and makes it difficult, if not impossible, for current abortion facilities to move or new abortion facilities to be constructed.

In *Fox Valley Reproductive Health Care v. Arft,* 446 F.Supp. 1072, 1073–1074 (E.D.Wisc.1978), the court found that the plaintiff abortion clinic sufficiently established irreparable harm. The town ordinance challenged in that case is very similar to the ASTCA and its regulations here, in that (1) the town ordinance applied generally to any nonhospital facility at which surgical, diagnostic, or therapeutic procedures were performed; (2) certain provisions applied specifically to abortion clinics; and (3) the ordinance was comprehensive, regulating licensing, building plans and specifications, supplies and equipment, medical policies and procedures, record keeping, patient care, and physician and nurse qualifications. The plaintiff in *Fox Valley* contended that irreparable harm was threatened, because the high cost of bringing the facility in compliance with the ordinance would force it to raise its current fee of $150 to a fee of between $300 and $500, an amount which would be beyond the economic means of poor women. The court held that this contention, "in conjunction with the solicitude courts have shown for a woman's right to freedom from interference in deciding whether to seek an abortion," supported a finding that irreparable harm was threatened. *Fox Valley,* 446 F.Supp. at 1074.

In the present case, plaintiffs have also demonstrated that the extensive regulations force those offering abortion services to raise their fees for abortion services.[13] This may indeed place the abortion procedure beyond the economic means of some women.

Plaintiffs have also demonstrated that the extensive ASTCA regulations discourage or "chill" those desiring to offer abortion services from opening an abortion facility or from adding abortion services to the services they already provide at their facilities. Margaret Moe testified at the hearing that she has desired to offer abortion services at the two health care clinics she operates since 1974. She contacted the IDPH on various occasions from 1974–1982, and was told on each occasion that abortion facilities must secure an ASTC license and comply with the ASTCA regulations.[14] Because of the extensive, expen-

---

**13.** Dr. Ragsdale testified at the preliminary injunction hearing that his current fee for an abortion is approximately $250. Dr. Ragsdale estimated that if he were to move his practice to a facility similar to his current facility, which does not fully comply with the ASTCA regulations, he would have to increase by $22.45 the fee per patient over the next two years to cover his costs. Plaintiffs' Exhibit No. 17. Relocating his practice to a building in total compliance with the regulations, on the other hand, would add another $25.21 to the increase, making the total increase in fee per patient $47.66. Plaintiffs' Exhibit No. 18.

**14.** Margaret Moe also testified that she telephoned the IDPH on November 18, 1985, to find out whether the IDPH still requires all abortion facilities to be licensed. At that time, an employee in the division of ASTC licensing informed her that the IDPH was not currently requiring licenses for abortion facilities, but the IDPH "recommended" licensure. Margaret Moe had never before been informed that the IDPH was no longer requiring abortion facilities to obtain ASTC licenses. The court notes that it was not clear from this testimony whether the IDPH no longer requires ASTC licenses even for facilities "primarily devoted" to the performance of abortions. The testimony of Mary Lloyd Lowe, Deputy Chief Counsel for the Illinois Department of Public Health, and Defendants' Exhibit No. 2, an IDPH internal memoran-

sive, and, indeed, prohibitive physical plant requirements in the regulations, Margaret Moe decided she could not offer abortion services at her clinics, and she still does not offer abortion services at her clinics.

In addition, plaintiffs have also shown that the certificate of need requirement of the HFPA makes it extremely difficult, if not impossible, for those desiring to provide abortion services to construct a facility or move to a new location. Under the certificate of need process set out in the HFPA, those desiring to open or move to a new facility must complete a lengthy, detailed application,[15] in which the applicant must disclose the fact that abortions will be performed at the proposed facility and must identify the ownership of the proposed facility. The general public may obtain a copy of this application through the state freedom of information law.[16] Ill. Rev.Stat. ch. 116, para. 201, *et seq.* Also, as part of the certificate of need process, the "recognized areawide health planning organization" or the IDPH must provide an opportunity for, and notice of, a public hearing "for the purpose of allowing the applicant and any interested person to present public testimony concerning the approval, denial, renewal or revocation of the [certificate of need]." HFPA § 8.

Given the current climate of the abortion debate, placing information in the hands of the public, such as the ownership of a facility in which persons propose to provide abortion services, subjects both the owner of the building and the proposed provider to the possibility of harassment and even threats of violence to themselves, their families and their friends.[17] In the case of Dr. Ragsdale, after the public received notice of a hearing on a proposed new site for the NIWC, but before the hearing took place, the landlord of the proposed site, with whom Dr. Ragsdale had an informal agreement, withdrew the site. Dr. Ragsdale secured a second site before the public hearing. Dr. Ragsdale entered a formal agreement with the landlord of this second site. Approximately 1,200 people attended the hearing on March 14, 1985. The hearing began at 7:00 p.m. with a statement by Dr. Ragsdale announcing the NIWC's proposed move. No other statement could be heard for the rest of the hearing, which lasted until 10:00 p.m., because of the shouting and generally riotous atmosphere. Friends of Dr. Ragsdale, fearing for his safety, escorted the Ragsdale family from the hearing. The landlord for the second site withdrew the site within 48 hours of the hearing, despite the formal agreement he had entered with Dr. Ragsdale. The areawide health planning organization in the area of the proposed new sites of the NIWC did eventually determine that there was a need for the NIWC.[18] However, by the time this determination was made, Dr. Ragsdale no longer had a site to which he could move the NIWC. As it now stands, the NIWC, the only outpatient abortion facility in all of northwest Illinois, will close December 31, 1985 without a relocation site.

In her testimony at the hearing, Margaret Moe pointed out yet another way in

dum written by Michael Anderson, indicate that the IDPH still requires licensure for those facilities "primarily devoted" to providing abortion services.

**15.** Dr. Ragsdale testified at the hearing that it took him five full working days to complete the HFPA application for a certificate of need.

**16.** At the preliminary injunction hearing, Mary Lloyd Lowe testified that the IDPH also releases ASTC license applications, when requested, pursuant to the Illinois Freedom of Information Act. Under the ASTCA and its regulations, such applications must also include a statement of ownership and a description of the services to be provided. ASTCA § 7a, 77 Ill.Admin.Code

§ 205.120. The ASTC license application is also lengthy and detailed, as demonstrated by Plaintiffs' Exhibit No. 21, Dr. Ragsdale's 1985 ASTC license application.

**17.** Dr. Ragsdale testified that the ASTCA requirements that an abortion facility be separately licensed and maintain an "identifiably separate" facility also subject abortion providers and their patients to threats and harassment.

**18.** *See* Plaintiffs' Exhibit No. 11, "Certificate of Need Investigative Staff Report to the Comprehensive Health Planning of Northern Illinois Regional Board and Project Review Committee."

which the certificate of need procedure under the HFPA impedes efforts to provide abortion services. Recently, many hospitals have had difficulty filling their available beds because of the emphasis on outpatient health care. With many empty hospital beds, it may be difficult for those who desire to provide abortion services to establish a "need" for an outpatient abortion facility.

As the above discussion makes clear, the challenged statutes and regulations do place a very real and a very heavy burden on the right of a woman to decide to terminate her pregnancy. The effect of the statutory and regulatory scheme is to increase the cost of abortions and decrease their availability. As a result of the scheme, Margaret Moe does not provide abortion services at her two Illinois clinics even though the physicians at the clinics are ready, willing, and able to perform abortions, and even though approximately sixty patients a week at the clinics request an abortion. Also, as a result of the scheme, the NIWC, the only outpatient abortion facility in northwest Illinois, will close at the end of this year without a relocation site.

The effect on women desiring to terminate their pregnancies, as clarified by the hearing testimony of Margaret Moe, is enormous. First, many women are not able to obtain an abortion in their own community, and they may find it difficult to secure a means of transportation to the nearest abortion facility, which may, in fact, be quite a distance from their community.[19] Having to make travel plans, arrange a day off and negotiate a loan, if needed, and then actually having to travel some distance to an abortion facility may delay the abortion and thereby increase the health risk or prevent the abortion altogether. Also, travelling a distance subjects a woman to greater expense, as the woman must pay for the cost of transportation and may need to hire a babysitter or miss a day of work and lose that day's pay. In addition, other factors affecting a woman's decision to terminate her pregnancy, such as her confidence in the competency of the physician performing the abortion and her ability to return for follow-up care, would be adversely affected if the woman were required to travel a great distance to obtain an abortion.[20]

The court finds that plaintiffs have clearly established that irreparable injury will result if the injunction is not issued. *See Doe v. Charleston Area Medical Center*, 529 F.2d 638, 644 (4th Cir.1975) ("*Roe v. Wade* and *Doe v. Bolton* ... establish beyond argument that denial under color of law of the right to abort, implicit in the right to be let alone, constitutes irreparable injury."). *Accord, Gary-Northwest Indiana Women's Services, Inc. v. Bowen*, 496 F.Supp. 894, 902 (N.D.Ind.1980).

The court finds that plaintiffs have established irreparable injury despite the argument of defendants that irreparable injury is not established because the IDPH does not enforce certain sections of the statutes and certain regulations. The State asserted in the hearing that the IDPH does not currently enforce the following statutes and regulations: (1) MPA § 16(1), requiring abortions to be performed in an ASTC or hospital; (2) ASTCA § 3(A), defining an ASTC as including any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, regardless of whether the facility is primarily devoted to this purpose; (3) Regulation 205.740, prohibiting the performance

---

**19.** Margaret Moe testified at the hearing that approximately 90% of the patients at her Elgin, Illinois clinic have no means of transportation, and approximately 50% of the patients at her Palatine, Illinois clinic have no means of transportation.

**20.** According to Margaret Moe, one of the greatest concerns of the patients at her clinics who desire to have an abortion is that Margaret Moe be able to refer them to a physician she knows is competent. Were Margaret Moe able to offer abortion services at her own clinics, she could, of course, assure her patients of the competency of the performing physicians.

of other than first trimester abortions in ASTCs; and (4) Regulation 205.760, requiring a report of each abortion procedure performed in an ASTC.

However, the IDPH has on no occasion formally notified physicians or abortion providers of its decision not to enforce these provisions. Also, the IDPH has not attempted to amend the regulations or introduce amendatory legislation in the Illinois legislature. With no formal commitment of nonenforcement, the statutory and regulatory requirements, even if not in fact enforced, clearly "chill" potential abortion providers. Moreover, even if there were a formal nonenforcement agreement, the discussion above demonstrates that plaintiffs have established irreparable injury resulting from the statutory and regulatory scheme, as written *and as enforced.*

The court notes, at this time, the irony implicit in the defendants' nonenforcement argument. At the preliminary injunction hearing, Dr. Hern, an expert on abortion practice, testified that most important factor in determining the safety of an abortion is the skill and experience of the physician. According to Dr. Hern, a physician who performs only a few abortions a year will be less skilled than physicians with a practice "primarily devoted" to the performance of abortions. Under the statutory and regulatory scheme, as defendants contend it is now enforced, physicians performing thousands of abortions yearly are more strictly regulated than physicians performing a few abortions a year.

## B. Harm To The Plaintiffs Outweighs Any Harm To Defendants

The threatened harm to the plaintiffs clearly outweighs any possible harm defendants may suffer if the court issues the preliminary injunction. Indeed, it is difficult to discern exactly what, if any, harm will befall defendants upon the issuance of this injunction, which will merely prevent defendants from enforcing the challenged statutes and regulations. *See e.g., Fox Valley,* 446 F.Supp. at 1074.

## C. Likelihood of Success On The Merits

In the landmark case of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court established that the right of privacy, grounded in the concept of personal liberty guaranteed by the Constitution, encompasses a woman's right to decide whether to obtain an abortion. *Id.* at 153, 93 S.Ct. at 726. At the same time, the Court acknowledged that this fundamental right "is not unqualified and must be considered against important state interests in abortion." *Id.* at 154, 93 S.Ct. at 727. However, as pointed out in *Roe,* 410 U.S. at 155, 93 S.Ct. at 727, and more recently in *City of Akron v. Akron Center For Reproductive Health,* 462 U.S. 416, 427, 103 S.Ct. 2481, 2491, 76 L.Ed.2d 687 (1983), restrictive state regulation of the right to choose abortion, as with other fundamental rights, must be supported by a compelling state interest.

In *Roe,* the Court identified the relevant state interests and the point at which those interests become compelling. According to the Court, the state has an interest in the health of the mother, and this interest becomes compelling at approximately the end of the first trimester. After the first trimester, the state may, in promoting this interest, "regulate the abortion procedure in ways that are reasonably related to maternal health." *Roe,* 410 U.S. at 164, 93 S.Ct. at 732. Until that time, a pregnant woman must be allowed, in consultation with her physician, to decide to abort and to effectuate that decision "free of interference by the State." *Id.* at 163, 93 S.Ct. at 732; *Akron,* 462 U.S. at 429–430, 103 S.Ct. at 2492–2493.

The Court in *Roe* based its identification of the end of the first trimester as the "compelling point" on the finding that, according to medical literature available in 1973, first trimester abortions are as safe for a woman as normal childbirth. *Roe,* 410 U.S. at 163, 93 S.Ct. at 731. In *Akron,* the Court noted that medical developments in the past decade "have extended the period in which abortions are safer than childbirth." *Akron,* 462 U.S. at 429, n. 11, 103

S.Ct. at 2492, n. 11.[21]   Still, the *Akron* Court held it "prudent ... to retain *Roe*'s identification of the beginning of the second trimester *as the approximate time* at which the State's interest in maternal health becomes sufficiently compelling ... (emphasis added)." *Id.* The court now turns to the *Roe* trimester standard, as interpreted in *Akron* and other cases, to provide the legal framework for the constitutional evaluation of the challenged statutes and regulations.

■   First, the court notes that the statutes and regulations here apply to all facilities in which any abortions are performed. None of the statutes or regulations exclude from their scope facilities in which first or early second trimester abortions are performed. However, this does not mean that the statutes and regulations are per se unconstitutional. As the *Akron* court noted, certain State regulations that have no "significant impact" on a woman's exercise of her abortion right during the first trimester may be permissible where justified by important State health objectives. *Akron,* 462 U.S. at 430, 103 S.Ct. at 2492. *See Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (upholding regulations which applied to first trimester abortions and required that a patient give written consent prior to the abortion, and that records be kept of all abortions); *Connecticut v. Menillo,* 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (upholding a statute requiring that only licensed physicians per-

form abortions, including first trimester abortions).

Neither does *Roe* stand for the proposition that any general medical regulation which applies to the performance of first and early second trimester abortions is per se constitutional.[22] As the Seventh Circuit stated in *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141, 1153–1154 (7th Cir.1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975):

> Furthermore, any proposed regulation, even if applied universally to all similar medical procedures, because of the fundamental right of a woman to procure an abortion during the first trimester, would have to meet a compelling governmental interest requirement. Thus, any general health regulations which would apply to first trimester abortions would have to be limited so as to give effect to the fundamental rights as established by *Roe* and *Doe;* that is, not be burdensome on a woman's right to decide to abort a pregnancy. *By this we mean that in all probability nothing broader than general requirements as to the maintaining of sanitary facilities and general requirements as to meeting minimal building code standards would be permissible.* (Emphasis added.)

Thus, any regulation, even a general regulation, which burdens a woman's right to choose to terminate her pregnancy during the first trimester would have to meet the compelling governmental interest require-

**21.** Dr. Ragsdale and Dr. Hern both testified at the hearing of the safety of the Dilation and Evacuation procedure, which has recently become the method most often utilized for abortions in the early part of the second trimester. In addition, defendants tendered as their Exhibit No. 6 the Standards for Obstetric-Gynecological Services, developed by the American College of Obstetricians and Gynecologists ("ACOG Standards") (6th ed. 1985). According to the ACOG Standards, and as noted by the *Akron* Court, uncomplicated abortions, up to 14 weeks from the last menstrual period, may be performed in a physician's office or an outpatient clinic. ACOG Standards, p. 60.

**22.** In *Abortion Coalition v. Michigan Department of Public Health,* 426 F.Supp. 471, 474–476 (E.D.

Mich.1977), the court, in dicta, indicated that general regulations imposed upon medically analagous procedures are not invalid as applied to first trimester abortions. However, at the same time, the court held certain provisions of the "general" statute to be unconstitutional as applied to first trimester abortions. Moreover, in *Birth Control Centers, Inc. v. Reizen,* 508 F.Supp. 1366 (E.D.Mich.1981), *aff'd in part, vac. in part,* 743 F.2d 352 (6th Cir.1984), the court struck down still more sections of the "general" Michigan Public Health Code, which required all freestanding surgical outpatient facilities to have transfer agreements with hospitals and to have six-foot corridors.

ment. In addition, under *Roe* and *Akron*, a regulation which burdens a woman's right to choose to terminate her pregnancy during the early second trimester must be "reasonably relate[d]" to the preservation and protection of maternal health. *Akron*, 462 U.S. at 430–431, 103 S.Ct. at 2492–2493; *Roe*, 410 U.S. at 163, 93 S.Ct. at 731.

■■■ In the present case, plaintiffs have overwhelmingly demonstrated the burden that the challenged statutory and regulatory scheme places on a woman's right to choose to terminate her pregnancy during the first and early second trimester. As noted in the previous discussion of irreparable injury, the scheme, as written *and as enforced*, increases the cost and decreases the availability of abortions. Also, the scheme may delay the effectuation of a woman's decision to abort.

*Charles v. Carey*, 627 F.2d 772, 777 (7th Cir.1980), *app. after remand, sub nom. Charles v. Daley*, 749 F.2d 452 (7th Cir. 1984), instructs that once a plaintiff has shown that interference in the pregnancy termination decision is "sufficiently substantial and not de minimus," the State must show that there is compelling basis for the law and that the burden is not undue or unjustifiable. Here, plaintiffs have demonstrated that the challenged scheme substantially interferes with the pregnancy termination decision during the first and early second trimester.

Defendants, however, have failed to produce any evidence at all of a compelling or even rational basis for the challenged statutes and regulations. The defendants presented no evidence in their pleadings or

at the hearing that the statutes and regulations are medically necessary.[23] Dr. Barton, the defendant's expert in obstetrics and gynecology, testified at the hearing that he was of the opinion that there is a medical necessity for some regulation by the state of outpatient abortion facilities, but Dr. Barton did not testify as to the medical necessity of any of the statutes or regulations here challenged. Also, Dr. Barton agreed that there is no medical reason to single out abortion from other medically analagous procedures for different regulation. Defendants, at best, have shown that selected regulations, such as Regulation 205.730(b)(2)(a), which sets out the qualifications for counselors, are consistent with accepted medical practice. This is not equivalent to a showing of medical necessity.

Plaintiffs have established the burdensome nature of the scheme as a whole. Defendants have failed to demonstrate a compelling, or even a rational, basis for the statutory and regulatory scheme. Therefore, the court now finds that there is a reasonable likelihood that plaintiffs will succeed on the merits.

**D. Harm To The Public Interest**

■■■ In *Fox Valley*, 446 F.Supp. at 1075, the court found that the public's interest would not be disserved by the issuance of the preliminary injunction. The court reasoned that the public's interest lies in the enforcement of that which is mandated by the Constitution, and the Constitution mandated that the abortion regulation challenged in that case not be im-

---

**23.** Plaintiffs, on the other hand, presented testimony by Dr. Ragsdale and Dr. Hern that the regulations are not only medically unnecessary, but some of the regulations, particularly those requiring ASTCs to be hospital-like facilities, may be medically detrimental, for women often find it psychologically reassuring when they are able to effectuate their decision to abort in a comfortable, more personalized atmosphere.

Defendants' difficulty in providing evidence of the medical necessity of the burdensome statutes and regulations challenged here is understandable, given that other courts have already found that similar or identical provisions burden a woman's right to choose to terminate her

pregnancy without furthering a compelling state interest. *See Arnold v. Sendak*, 416 F.Supp. 22 (S.D.Ind.1976) (finding unconstitutional an Indiana statute requiring all abortions to be performed in hospitals or licensed health care facilities), *aff'd mem.*, 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976); *Village of Oak Lawn v. Marcowitz*, 86 Ill.2d 406, 55 Ill.Dec. 916, 427 N.E.2d 36 (1981) (finding the portion of the definition of an ASTC including "any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose" to be unconstitutional).

posed. Likewise, in the present case, the Constitution mandates that the challenged statute and regulations not be applied to physicians who perform first trimester abortions or early second trimester DE abortions, or to the facilities in which these procedures are performed.

Of course, the public also has an interest in the preservation and protection of a patient's health. However, contrary to the argument of the State's Attorney at the preliminary injunction hearing, the injunction which the court now issues will not disserve this interest. At the hearing, the State's Attorney argued that, if the court issued the injunction prayed for, this would "open the door" to substandard abortion facilities in Illinois. Not so. The injunction here will not leave abortion clinics, such as the NIWC, free from all state regulation. On the contrary, such facilities will still have to meet the standards set by local building codes. Also, physicians performing abortions are obligated to practice surgery with care and will still be subject to disciplinary action under the remaining subsections of section 16 of the MPA. The court therefore finds that the public interest will be served by the issuance of this preliminary injunction.

### E. Scope of The Preliminary Injunction

Having found preliminary injunctive relief is appropriate in this case, the court now turns to the scope of the preliminary injunctive relief granted. In the above discussion dealing with the plaintiffs' demonstration of the likelihood of their success on the merits, the court found that defendants have failed to show a compelling need or even a rational basis for the burdensome statutory and regulatory scheme. Accordingly, the court preliminarily enjoins defendants from enforcing the challenged statutes and regulations against any plaintiffs who offer or perform first or early second trimester abortions.

### V. Conclusion

For the reasons set forth above, the court grants plaintiffs' motion for certification of two plaintiff classes and one defendant class, with some modification. Also, the court grants plaintiffs' motion for preliminary injunction, and hereby enjoins defendants from enforcing the challenged statutes and regulations against any plaintiff offering, performing, or desiring to offer or perform a first or early second trimester abortion.