941 F.2d 501
 20 Fed.R.Serv.3d 1202
 Richard M. RAGSDALE, M.D., individually and on behalf of all
other physicians similarly situated, et al.,
Plaintiffs-Appellees,
v.
Bernard J. TURNOCK, Director of the Illinois Department of
Public Health, et al., Defendants-Appellees,
and
Kenneth M. Reed, as Expectant Father and Next Friend of Baby
Reed, et al., Proposed Intervenors-Appellants.
Richard M. RAGSDALE, M.D., individually and on behalf of all
other physicians similarly situated, et al.,
Plaintiffs-Appellees,
and
Ritaellen M. Murphy and Penny R. Greenwood, members of the
Plaintiff class consisting of all Illinois women of
child-bearing age who desire or may desire an abortion
sometime in the future, Plaintiffs-Appellants,
v.
Bernard J. TURNOCK, Director of the Illinois Department of
Public Health, et al., Defendants-Appellees,
and
Kenneth M. Reed, as Expectant Father and Next Friend of Baby
Reed, et al., Proposed Intervenors-Appellants.
 Nos. 90-1907, 90-2123, 90-1908 & 90-2122.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 4, 1990.
Decided Aug. 20, 1991.
 
 Alan S. Gilbert, Susan M. Kornfield, Lorie A. Chaiten, Sonnenschein, Nath & Rosenthal, Colleen K. Connell, Chicago, Ill., for plaintiffs-appellees.
 Kathleen Kreisel Flahaven, Asst. Atty. Gen., Office of the Atty. Gen., Terry L. McDonald, Harold E. McKee, III, Asst. States Attys., Cecil A. Partee, Office of the State's Atty. of Cook County, Chicago, Ill., for defendants-appellees.
 Craig H. Greenwood, Downers Grove, Ill., for proposed intervenors-appellants.
 Lawrence J. Joyce, amicus curiae, pro se.
 Before POSNER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 The party class representatives in this case moved for approval of a proposed settlement and consent decree, and the district court granted their motion. Plaintiffs had challenged statutes relating to abortion. After the parties reached an agreement, two expectant fathers representing the interests of fetuses moved to intervene as of right. The district court denied their motion, and they have appealed. Also, two purported members of the plaintiff class objected to the consent decree and have appealed.
 
 BACKGROUND
 
 2
 This case concerns the constitutionality of certain Illinois laws having an impact on the performance of abortions. The plaintiffs sue on behalf of a class of physicians who perform or desire to perform abortions in Illinois and on behalf of a class of women who may desire abortion services. The defendants are various officers of the executive branch: the Director of the Illinois Department of Public Health, the Attorney General, the Director of the Department of Registration and Education, and the State's Attorney of Cook County who defends on behalf of a class consisting of the State's Attorneys of Illinois.
 
 
 3
 The plaintiffs filed this suit on June 28, 1985. They challenged three Illinois statutes and numerous regulations. They originally asked the district court "to enjoin defendants from enforcing, in derogation of a physician's right to perform, and a woman's right to obtain, first and early second trimester abortions, three Illinois statutes: (1) Section 16(1) of the Illinois Medical Practice Act ("MPA"), Ill.Rev.Stat. ch. 111, para. 4433(1) [now para. 4400-22(1)(a)-(e) ]; (2) the Ambulatory Surgical Treatment Center Act of Illinois ("ASTCA"), Ill.Rev.Stat. ch. 111 1/2, paras. 157-8.1-157-8.16, and the regulations promulgated thereunder; and (3) the Illinois Health Facilities Planning Act ("HFPA"), IIl.Rev.Stat. ch. 111 1/2, paras. 1151-1168, and the regulations promulgated thereunder." Ragsdale v. Turnock, 625 F.Supp. 1212, 1215 (N.D.Ill.1985).
 
 
 4
 "Essentially, section 16(1) [of the MPA] prohibits physicians from performing even one abortion in their offices, and requires physicians who wish to provide abortion services in non-hospital environments to comply with the ASTCA and the HFPA." Id. at 1216.
 
 
 5
 The ASTCA provides for licensure of all ambulatory surgical treatment centers (ASTCs) with regulations which, in effect, "require ASTCs to be the functional equivalent of small hospitals." Id. The HFPA requires all ASTCs to obtain a certificate of need. Id.
 
 
 6
 Upon finding that plaintiffs had established the burdensome nature of the scheme as a whole, and that defendants had failed to establish a compelling basis for it, the district court enjoined defendants, pendente lite, "from enforcing the challenged statutes and regulations against any plaintiff offering, performing, or desiring to offer or perform a first or early second trimester abortion." Id. at 1231.
 
 
 7
 This court affirmed (by a divided panel) with one exception. The portion of the injunction against enforcement of the "second trimester hospitalization requirement" was vacated as moot. Ragsdale v. Turnock, 841 F.2d 1358, 1376 (7th Cir.1988). The basis for the exception was that "the defendants have conceded, at least since 1983, that this requirement is unconstitutional under governing Supreme Court decisions and is therefore not enforced." Id. at 1365.
 
 
 8
 In affirming, this court noted that although "there may well be facets of the statute and regulations which would individually pass muster ... we are constrained to affirm the district court's injunction of the scheme as a whole." In response to a request for severance of unconstitutional portions, the court indicated its inability to untangle the constitutional from the unconstitutional provisions. Id. at 1375.
 
 
 9
 Defendants filed a Notice of Appeal, seeking review by the United States Supreme Court. On July 3, 1989, the Supreme Court entered an order accepting the case for oral argument but postponing the question of jurisdiction until the hearing on the merits. Turnock v. Ragsdale, 492 U.S. 916, 109 S.Ct. 3239, 106 L.Ed.2d 587 (1989). Oral argument was scheduled for December 5, 1989, but on November 22, 1989, the parties filed a joint motion to defer further proceedings in the Supreme Court pending submission of the proposed Consent Decree to the district court for approval. The Court granted the parties' joint motion. Turnock v. Ragsdale, --- U.S. ----, 110 S.Ct. 532, 107 L.Ed.2d 530 (1989).
 
 
 10
 The consent decree, unlike the preliminary injunction, is not a blanket prohibition of enforcement of the statutes at issue; it allows some regulation affecting abortions performed during the first half of pregnancy. Understanding the entire decree requires careful attention to details, and we see no reward in attempting a summary or detailed description here. For the terms of the decree and the observations of the district court concerning it, see Ragsdale v. Turnock, 734 F.Supp. 1457, 1460-62, 1466-70 (N.D.Ill.1990). The defendants claim that the decree benefits the state:
 
 
 11
 The decree has, for the first time since November 27, 1985, reinstated DPH's authority to regulate outpatient surgical facilities to the extent they perform abortions. Prior to the entry of the decree, the IDPH had been enjoined from exercising its statutory authority to license, regulate, and inspect such facilities. Clearly, the decree furthers the IDPH's interests in ensuring that surgical procedures, including abortions, be performed under circumstances ensuring maximum safety.
 
 
 12
 Brief of defendants-appellees at 14-15.
 
 
 13
 Because this case is a class action, the settlement could not be effective until all members of the classes were notified and it was approved by the district court. Fed.R.Civ.Pro. 23(e). The district judge conducted a fairness hearing (after notice, including publication) at which all class members were permitted to appear. All objectors to the proposed settlement were initially required to submit their responses by February 13, 1990. On February 13, Kenneth M. Reed and Mark I. Aughenbaugh as next friends of unborn children moved to intervene on behalf of "a class consisting of all Illinois unborn babies." On February 22, the district court denied the motion to intervene, but allowed the proposed intervenors to submit briefs as amici curiae.
 
 
 14
 Overall, the district court received 326 telephone calls, 2 telegrams, and 1266 letters, and the judge reviewed all of the submissions. On February 23, 1990, the district court conducted a fairness hearing. At the hearing, the court heard objections from amici who had filed briefs with the court and also allowed anyone attending the hearing to speak. The lawyer for the Murphy and Greenwood plaintiff class members and the proposed intervenors was allowed to speak. All of the objections argued on appeal appear to have been raised. On March 22, 1990, the district court approved the consent decree. Ragsdale v. Turnock, 734 F.Supp. 1457 (N.D.Ill.1990).
 
 
 15
 The appellants challenge both the refusal of the district court to allow the intervention of parties representing the interest of fetuses and the decision of the district court that the consent decree is lawful, reasonable, fair, and adequate.
 
 INTERVENTION
 
 16
 The "petition to intervene and to maintain a class action of baby Reed and baby Aughenbaugh" was filed February 13, 1990, the last day initially set by the district court for filing objections to the proposed settlement. The petition was made as next friends by Kenneth Reed and Mark Aughenbaugh. They alleged their wives were pregnant, but did not allege any threat of abortion. The gestational age was not alleged, although that fact was material to any impact the consent decree could have on them. The petition invoked Rule 24(a)(2) of the Federal Rules of Civil Procedure, but was not, as required by Rule 24(c), "accompanied by a pleading setting forth the claim or defense for which intervention is sought."
 
 
 17
 Rule 24(a) does not require that an applicant must be permitted to intervene where "the applicant's interest is adequately represented by existing parties." Judge Nordberg orally denied the petition but granted Mr. Reed and Mr. Aughenbaugh leave to appear as amici curiae. His principal reason was that the objectors had not shown that the state had not adequately protected the interest of the fetuses. Ragsdale, 734 F.Supp. at 1459 n. 4. The author of this opinion agrees that the petition failed to make this showing.
 
 
 18
 Rule 24 also requires that the application be timely. Timeliness requires a consideration of all the circumstances of a case and not just the point to which the suit has progressed. NAACP v. New York, 413 U.S. 345, 365-66, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973). This court has required that in determining timeliness under the totality of the circumstances, four factors should be considered:
 
 
 19
 (1) the length of time the intervenor knew or should have known of his or her interest in this case, (2) the prejudice to the original party caused by the delay, (3) the resulting prejudice to the intervenor if the motion is denied, and (4) any unusual circumstances.
 
 
 20
 South v. Rowe, 759 F.2d 610, 612 (7th Cir.1985).
 
 
 21
 The prejudice to the present parties of a grant of intervention (factor 2) is obvious and substantial. After pursuit of litigation for several years, they expended great effort in working out a settlement to which the proposed intervenors are opposed. Once parties have invested time and effort into settling a case it would be prejudicial to allow intervention. Farmland Dairies v. Commissioner of the New York State Dept. of Agriculture and Markets, 847 F.2d 1038, 1044 (2d Cir.1988); City of Bloomington v. Westinghouse Electric Corp., 824 F.2d 531, 535 (7th Cir.1987) ("intervention at this time would render worthless all of the parties' painstaking negotiations because negotiations would have to begin again and [the intervenor] would have to agree to any proposed consent decree"); Jones v. Caddo Parish School Bd., 735 F.2d 923, 935 (5th Cir.1984). A case may never be resolved if another person is allowed to intervene each time the parties approach a resolution of it. United States v. City of Chicago, 908 F.2d 197, 199 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991). This court has held that once complex settlement negotiations that are well publicized begin parties may not be allowed to intervene. City of Bloomington, 824 F.2d at 535.
 
 
 22
 Prejudice to the intervenors (or other members of the proposed class) if intervention is denied (factor 3) is problematic at best. The existing preliminary injunction would presumably remain in effect if intervention were granted, and the litigation would presumably continue before the Supreme Court to resolve the reserved question of jurisdiction and the merits of the preliminary injunction if jurisdiction were found. The intervenors (and the class member appellants) apparently believe that this case is one in deciding which the Supreme Court might overrule Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and thus permit greater state regulation (or prohibition) of abortions. That this hope is precarious is emphasized by the fact that the Supreme Court initially postponed consideration of its own jurisdiction of this case and later granted the motion of the parties to defer proceedings pending submission of the proposed consent decree to the district court for approval.
 
 
 23
 The motion to intervene does not demonstrate the length of time Mr. Reed or Mr. Aughenbaugh knew of their wives' pregnancies, of this action, or of the proposed consent decree (factor 1). This action was begun in 1985. The Attorney General's willingness to compromise became public knowledge by November 22, 1989.
 
 
 24
 We see no unusual circumstances (factor 4) significantly supporting intervention. The state officers who are defendants vigorously defended against the challenges within the bounds of existing law and court decisions. They began to work out a settlement by consent decree only after the district court granted a preliminary injunction finding a likelihood, if not certainty, that plaintiffs' challenges would succeed, and this court affirmed (except for a portion as to which the case was deemed moot because enforcement was withheld in recognition of unconstitutionality). Although the courts recognized that the issue at the preliminary injunction stage pertinent to constitutionality was whether plaintiffs have shown a better than negligible likelihood of success, Ragsdale, 841 F.2d at 1366 n. 6; Ragsdale, 625 F.Supp. at 1224, the language of both the district court opinion and the majority opinion in this court seems to indicate conviction that the statutes are unconstitutional if fully applied.[1]
 
 
 25
 The General Assembly is left free to enact new statutes or to amend the present statutes at any time and for any reason. Ragsdale, 734 F.Supp. at 1461 nn. 10 & 11. Also, the consent decree provides for changes in regulations based upon changes in medical or scientific knowledge and for the right to ask the court to modify the gestational age upon which certain provisions of the consent decree depend based upon further development of medical or scientific knowledge. Id. at 1469-70.
 
 
 26
 The author of this opinion concludes the application for intervention was not timely and would affirm for that reason as well. Additionally, Judge Posner (post at 19) may be correct in reliance on Diamond v. Charles, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), as establishing that denial of intervention should be affirmed because the proposed intervenors lack standing, although Diamond dealt with a physician's conscientious objection to abortion, and the case was in a somewhat different procedural posture.
 
 OBJECTORS MURPHY AND GREENWOOD
 
 27
 All four appellants appeared by one counsel and filed a single brief. No distinction is made between arguments raised on behalf of proposed intervenors, Reed and Aughenbaugh, and those on behalf of members of the plaintiff class, Murphy and Greenwood (Illinois women of child bearing age who desire or may desire an abortion sometime in the future).
 
 
 28
 Most of the arguments in the brief attack the doctrine of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and are consistent with the position urged by the proposed intervenors on behalf of unborn children. These arguments, and others which concern only the interests of unborn children, are not properly before us and will not be addressed.
 
 
 29
 Appellants Murphy and Greenwood also make some arguments that are at least facially grounded on a woman's interest in protection of her health if she sought to have an abortion. One portion of appellants' brief argues, "The medical health of the women of child bearing age of the State of Illinois has been compromised...." Appellants' Brief at pp. 46-48.
 
 
 30
 This is an argument that the consent decree is too favorable to the plaintiffs because it goes too far in enjoining enforcement of portions of the statutes and regulations. Appellants Murphy and Greenwood may individually believe in this argument, but they have no standing to make it in their capacity as members of the plaintiff class.
 
 
 31
 There are other arguments in the brief challenging the propriety of the consent decree, i.e., that when the constitutionality of a state statute is an issue, it is improper for a federal court to issue a consent degree against enforcement upon the consent of the Attorney General and other members of the executive department, and that defendants have, in effect, re-written the statutes. It is sufficiently clear that these arguments are offered in support of the claim that the decree is too favorable to plaintiffs, and appellants Murphy and Greenwood therefore have no standing to make them as members of the plaintiff class.
 
 
 32
 Thus, there is no party before this court with standing to challenge questions of propriety of the settlement.
 
 
 33
 Accordingly, we AFFIRM the district court's denial of intervention, and DISMISS the appeals of the proposed intervenors and appellants Murphy and Greenwood.
 
 
 34
 POSNER, Circuit Judge, concurring in the opinion in part, and in the judgment.
 
 
 35
 Judge Flaum is rightly concerned with the district court's failure to probe the adequacy of the settlement embodied in the consent decree that the court approved. But Judge Fairchild and I believe that there is no one before us who is entitled to challenge the consent decree, because the denial of the motion to intervene by the two fathers of fetuses must be affirmed and the women's appeal from the consent decree must be dismissed because they lack standing to appeal even though they were parties in the district court. On the first issue, however--the propriety of the denial of intervention to the fathers--Judge Fairchild's and my grounds differ, while on the second (with which I shall begin) I write in amplification of his discussion.
 
 
 36
 The female appellants, being Illinois women of child-bearing age, are members of the plaintiff class because it is defined as "all Illinois women of child-bearing age who desire or may desire an abortion sometime in the future " (emphasis added). Members of a class whose rights will by operation of res judicata be extinguished by the settlement of the class action of course have standing to object to the settlement and to press their objections on appeal, but like other litigants they must show that the order to which they object actually harms them. Ordinarily the harm arises from the fact that the settlement does not provide the class with as much relief as the objecting member had wanted. He claims that the named plaintiffs prematurely and excessively bargained away his rights. That is not the objection of the female appellants in our case. Their objection is the opposite: that the settlement is too favorable to the plaintiff class. Like the would-be intervenors, these women oppose abortion and want the statute enforced a outrance. To object to a settlement on the ground that you shouldn't have done as well in the settlement as you did identifies you as an ideological litigant; and an affront to one's ideology is not an interest that will support standing to sue. Diamond v. Charles, 476 U.S. 54, 66-67, 106 S.Ct. 1697, 1705-06, 90 L.Ed.2d 48 (1986); Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982); United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).
 
 
 37
 Maybe the class was misdefined, and women who, though of child-bearing age, are opposed to the availability of inexpensive abortions should not have been included because they lack the relevant community of interest with women who consider themselves harmed by the statute. If the female appellants had not been members of the class they would have had to seek leave to intervene in the lawsuit, like the men, In re Fine Paper Antitrust Litigation, 695 F.2d 494, 499 (3d Cir.1982), and their claim to intervene would have fared no better than the men's. But even if the class was properly defined to include these women, which would make them parties in the district court without their having to intervene, a member of a class does not have standing to challenge a settlement that favors him in a tangible sense, though it offends him in an ideological sense. No one has such standing.
 
 
 38
 Because the women lack standing to maintain this appeal even though by virtue of being class members they were entitled to the rights of parties in the district court, it is critical to the maintenance of the appeal to decide whether the men should have been allowed to intervene in the district court either to represent the interests of the fetuses affected by the consent decree or to represent their own interests as fathers of such fetuses. Judge Fairchild believes that these would-be intervenors had failed to show that the State of Illinois is an inadequate representative of the fetuses who will be affected by the consent decree and therefore had failed to satisfy an essential requirement of Rule 24(a)(2) of the Federal Rules of Civil Procedure for intervention as a matter of right. I have my doubts, as I also do about Judge Fairchild's alternative ground for upholding the denial of intervention--that the motion to intervene was untimely. On November 22, 1989, the named plaintiffs and the Illinois attorney general jointly requested the Supreme Court to postpone oral argument pending the submission of a proposed consent decree to the district court. The district judge fixed February 13, 1990, as the deadline for submitting objections to the decree. The motion to intervene was filed that day. The timing is suspicious. It may well indicate a desire to disrupt the schedule that the judge had set for consideration of the proposed decree. Yet the motion was filed only three months or so after the movants first learned (sometime in November) that the attorney general had decided in effect to throw in the towel. It is true that this was years after the suit had been brought. But a motion for intervention filed back then would have been dismissed out of hand. There was every reason to expect the Attorney General of Illinois to defend the statute as vigorously as he could. It was not until November of 1989 that this expectation was shattered. The petition for intervention was filed shortly afterward. It may still have been untimely (a question on which we usually defer to the district judge, United States v. City of Chicago, 897 F.2d 243 (7th Cir.1990)), but I find Judge Fairchild's analysis of the point unconvincing because he focuses on the delay from the inception of the suit, and that is the wrong focus. United States v. City of Chicago, 870 F.2d 1256, 1263 (7th Cir.1989). See also United States v. South Bend Community School Corp., 710 F.2d 394, 396 (7th Cir.1983).
 
 
 39
 The proposition that the attorney general is an adequate representative of the fetuses that will be aborted if the consent decree is approved fictionalizes the notion of "adequacy" of representation, and I am not a fan of legal fictions. The consent decree guts a statute that was (to speak realistically) designed to limit the number of abortions performed in Illinois by making abortion more expensive. The statute imposed onerous requirements, in the name of health, on abortion providers. In invalidating it this court found the health rationale less than persuasive, so that the statute stood exposed as an attempted end run around Roe v. Wade. Ragsdale v. Turnock, 841 F.2d 1358, 1371-75 (7th Cir.1988). The statute's basic requirements are that abortions may not be performed in doctors' offices and that abortion clinics have to be so well equipped to deal with possible medical emergencies as to be the equivalent of small hospitals. The joint effect of these requirements, had they not been enjoined from the outset, would have been to increase the cost of abortion in Illinois substantially, because few public hospitals are willing to perform abortions.
 
 
 40
 The consent decree preserves very little of the statute. Ragsdale v. Turnock, 734 F.Supp. 1457 (N.D.Ill.1990). The "small hospital" requirements are confined essentially to facilities that perform abortions after the eighteenth week of pregnancy. So first-trimester abortions--the vast majority (more than 90 percent nationwide, though I don't have figures for Illinois)--are unaffected by the statute. And the decree abandons the statute's ban on abortions performed in a physician's office.
 
 
 41
 The Attorney General of Illinois thus knuckled under to this court's divided panel decision even though the Supreme Court had scheduled the case for oral argument of his appeal, and by doing so he doomed the first-trimester fetuses who would have been saved if the statute had been saved. He traded these fetal interests for other goods, such as an end to a costly lawsuit that he feared losing, or more likely (for he might well have won the case in the Supreme Court) for political advantage. But traded them he has. Perhaps the beneficiaries of the trade include a few second- or third-trimester fetuses, but almost all abortions are performed by the eighteenth week of pregnancy.
 
 
 42
 I know the government is presumed to be an adequate representative of a proposed intervenor when it is "charged by law with representing [the proposed intervenor's] interests." American National Bank & Trust Co. v. City of Chicago, 865 F.2d 144, 148 (7th Cir.1989); United States v. South Bend Community School Corp., 692 F.2d 623, 627 (7th Cir.1982); see United States v. Hooker Chemicals & Plastics Corp., 749 F.2d 968, 984-90 (2d Cir.1984) (Friendly, J.). And since the case law treats the state as the guardian of the interests of fetuses carried in the wombs of women in the state, Roe v. Wade, 410 U.S. 113, 150, 93 S.Ct. 705, 725, 35 L.Ed.2d 147 (1973), it is an easy step to the conclusion that the state is a presumptively adequate representative of those interests. The step was taken in Keith v. Daley, 764 F.2d 1265, 1270 (7th Cir.1985), and Roe v. Casey, 623 F.2d 829, 832 n. 7 (3d Cir.1980). But a real presumption is rebuttable ("conclusive presumption" is an oxymoron), and if this one is not, why did the court in Keith bother to point out that the attorney general was defending the abortion statute at issue in that case adequately? 764 F.2d at 1270. In negotiating the consent decree in the present case, the attorney general pretty much abandoned the fetuses to the abortionist's knife.
 
 
 43
 To speak in this dramatic fashion is of course to treat fetuses as people--as holders of interests--rather than as inanimate objects; and the status of fetuses is controversial, to say the least. But for many purposes the law does treat them as people. In Illinois, if you shoot a pregnant woman in the abdomen and kill the fetus, you are guilty of the crime of intentional homicide of an unborn child, and the penalty is almost as severe as for first-degree murder; the only difference is that the death penalty may not be imposed. Ill.Rev.Stat. ch. 38, p 9-1.2. This is true regardless of the age of the fetus. Illinois has also extended its tort statute for wrongful death of a human being so that it covers fetuses from the moment of conception. Ill.Rev.Stat. ch. 70, p 2.2. No one suggests that in extending to first-trimester fetuses legal protections originally designed for children, the state is violating Roe v. Wade, so long as it doesn't try to use these legal protections to interfere with abortions privileged by that decision--in other words, so long as it protects fetuses against third persons but not against mothers upon whom Roe v. Wade confers a constitutional right of abortion, or against their agent, the abortionist. It follows, I should think, that fetuses are (in Illinois anyway) persons for purposes of a decision on what weight to give their interests in applications for intervention made under Rule 24(a)(2). That rule doesn't create or define interests; it takes those interests as it finds them in state law or other sources of legally protected rights. A fetus's father is not entitled under existing law to prevent the mother from having an abortion, Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 70-71, 96 S.Ct. 2831, 2841-42, 49 L.Ed.2d 788 (1976), but who is better fitted to represent the fetus if the state's attorney general abandons the protective responsibility that law places on him? "Abandonment" of fetal interests is a fair description of the attorney general's action in negotiating this consent decree.
 
 
 44
 Judges have a natural inclination to fictionalize "adequacy" of representation in order to prevent the courts from being swamped by multiparty litigation. (In this case intervention would lead to the nullification of the consent negotiations and the restoration of the case to the Supreme Court's docket, since a case can't be settled without the consent of all the named parties and these would-be intervenors are not prone to compromise.) If a state in defending an environmental statute gave less weight to preserving forests than to preserving wetlands, it would not follow that arborealists should be permitted to intervene to present evidence on behalf of their beloved trees. This is the sense of such decisions as United States v. Hooker Chemicals & Plastics Co., supra, and of our own United States v. 36.96 Acres of Land, 754 F.2d 855 (7th Cir.1985). More than docket pressures are at work in these cases. Environmental litigation involves tradeoffs among human health, aesthetic and ecological concerns, and commercial values, and the government agencies charged with administering these statutes should not be presumed to be incompetent to balance the competing considerations in a reasonable way. This case, too, could be thought to involve tradeoffs between "statistical lives" (i.e., low probabilities of illness or death) and other valuable goods, inasmuch as the abortion statute does not forbid abortions but merely makes them more costly. That is one way to look at the case but another is that a government official has decided to allow a class of what for purposes of this suit we must treat as human beings to die because the official lacks the stomach, political or otherwise, to litigate the case in the Supreme Court. In such a case the presumption that he is representing the class adequately might be thought rebutted.
 
 
 45
 I need not pursue the question. Intervention was properly denied, regardless of adequacy of representation, simply because to be allowed to intervene as a party you must have standing to litigate and these movants do not. It is true that Diamond v. Charles is noncommittal on the question whether an intervenor must have standing. 476 U.S. at 69, 106 S.Ct. at 1707; see also id. at 73-74, 106 S.Ct. at 1709 (concurring opinion); Chiles v. Thornburgh, 865 F.2d 1197, 1212 (11th Cir.1989) (reviewing split in the courts of appeals). But this court has held that he must. Keith v. Daley, supra, 764 F.2d at 1268. He wants to be a party, in major part so that he can litigate if the other parties with whom he is aligned fall out of the case, which is just what has happened here. The state has dropped the torch; the fathers of potentially affected fetuses want to pick it up. They must therefore demonstrate that they have standing to litigate this case as plaintiffs and appellants.
 
 
 46
 They do have standing in the barebones Article III sense. As fathers of unborn children (as the State of Illinois chooses to regard fetuses from the moment of conception), they are harmed, albeit in merely a probabilistic sense--but that is enough for standing, North Shore Gas Co. v. EPA, 930 F.2d 1239, 1242 (7th Cir.1991), and cases cited there--by a consent decree that by reducing the cost of abortions makes it more likely (though not highly likely) that their unborn children will be aborted. They are also the natural representatives of a group of inarticulate and helpless persons whose lives are at stake, and the extinction of those lives is the sort of tangible injury that is the stuff of actual cases in the Article III sense.
 
 
 47
 But there are other criteria of standing besides whether the plaintiff or persons represented by him have suffered an actual injury, which is the Article III criterion. The pertinent one here is whether the person seeking party status is someone upon whom the statute confers a right of enforcement. North Shore Gas Co. v. EPA, supra, 930 F.2d at 1243. The movants want to intervene in order that the abortion statute may be enforced in its pristine form, uncontaminated by the attorney general's compromises. But it is a regulatory statute, and in general and also in regard to this particular statute private persons have no right (in our legal system, unlike for example the British) to enforce criminal or other regulatory statutes, unless of course the statutes also create private rights of action, which this one does not. Private persons can complain to the enforcement authorities and badger them to bring enforcement actions but they cannot force them to do so or stand in their place and bring the actions themselves. Some regulatory statutes, it is true, are interpreted to create implied private rights of action, but no one argues that the Illinois abortion statute should be so interpreted. And while I can imagine an argument that a woman who suffers a medical injury as a result of the failure of an abortion clinic to comply with the statute should be able to use the violation to establish medical malpractice, the argument is not made and anyway is not available to these intervenors; they are not within the hypothetically protected class. (The female appellants are, and their party status--as members of the plaintiff class--is unquestioned. But they have as I said earlier no standing to appeal a settlement on the ground that it gives them more than they want or are entitled to. Nor have they asked that they be realigned as parties defendant--in which event their lack of standing would rest on the same ground as the fathers'.) The would-be intervenors are persons distressed by the attorney general's refusal to enforce a regulatory statute to the hilt. Such persons have no standing to sue, and therefore they have no standing to intervene in this suit to prevent adoption of a consent decree that will disable the attorney general from enforcing the statute effectively.
 
 
 48
 Any doubt is dispelled by the Supreme Court's decision in Diamond v. Charles, supra. Diamond was a physician who supported another Illinois abortion statute held unconstitutional by this court. He had been permitted (rightly or wrongly we need not decide today) to intervene in the lower-court proceedings in order to defend the statute, and he tried to appeal the case to the Supreme Court, the state attorney general having acquiesced in our decision and refused to appeal. The Supreme Court held that Diamond lacked standing to maintain the appeal. A private citizen lacks a legally protected interest in the prosecution of another person. 476 U.S. at 64-65, 106 S.Ct. at 1704-05. See also Linda R.S. v. Richard D., 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973); Board of Trade v. SEC, 883 F.2d 525, 529 (7th Cir.1989). Hence no individual may "assert any constitutional rights of the unborn fetus. Only the State may invoke regulatory measures to protect that interest, and only the State may invoke the power of the courts when those regulatory measures are subject to challenge." Diamond v. Charles, supra, 476 U.S. at 67, 106 S.Ct. at 1706.
 
 
 49
 Any other conclusion would interfere with the separation of powers within state government, and that separation is not a proper matter of federal judicial concern. Risser v. Thompson, 930 F.2d 549, 552 (7th Cir.1991). Illinois has given its attorney general the exclusive responsibility to enforce the abortion statute. It has not parceled out that responsibility between him and a host of self-appointed private attorneys general. It is his decision to make whether and how vigorously to enforce the abortion statute, cf. Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985), and part of this decisional responsibility is deciding how vigorously to defend the statute in suits challenging its constitutionality. "The concerns for state autonomy that deny private individuals the right to compel a State to enforce its laws apply with even greater force to an attempt by a private individual to compel a State to create and retain the legal framework within which individual enforcement decisions are made." Diamond v. Charles, supra, 476 U.S. at 65, 106 S.Ct. at 1705. We may not use Rule 24(a)(2) to subvert the state's separation of powers by preventing the Attorney General of Illinois from exercising the responsibilities that the state has assigned to him, and to him alone.
 
 
 50
 Concern has been expressed that state or federal officials might use federal consent decrees to tie the hands of their successors or to disrupt the allocation of power between branches of state government. Frank H. Easterbrook, "Justice and Contract in Consent Decrees," 1987 U. Chi. Legal Forum 19; Michael W. McConnell, "Why Hold Elections? Using Consent Decrees to Insulate Policies From Political Change," id. at 295. A lame-duck state attorney general might agree to embody in a federal consent decree restrictions on the operation of the attorney general's office that might cripple his successor, or (as charged in this case) that might gut an arguably constitutional statute that had been duly enacted by the state legislature. By asserting that no one has standing to appeal the consent decree in this case, I may seem to be placing such gambits beyond possibility of appellate correction. That would be paradoxical, since one of my grounds for denying that any of the appellants has standing was that permitting the appeal would interfere with the internal state allocation of governmental powers. Concern with such interference has been held a proper ground for declining to approve a consent decree. Kasper v. Board of Election Commissioners, 814 F.2d 332 (7th Cir.1987).
 
 
 51
 The paradox is dispelled by reflection that if Attorney General Hartigan's successor should seek to enforce the statute in defiance of the consent decree and be met with a charge that he is violating the decree, he will be able to challenge its lawfulness on appeal, since the fact that the decree could not have been appealed by the usual route would make that a proper form of collateral attack. Cf. Martin v. Wilks, 490 U.S. 755, 768, 109 S.Ct. 2180, 2187-88, 104 L.Ed.2d 835 (1989). Or should the state legislature condition appropriations for the attorney general's office on his enforcing the statute notwithstanding the decree and the condition be challenged as a violation of the decree, the legislature can by this route, and for the same reason, obtain appellate review. (And in federal court, notwithstanding the intragovernmental character of such a suit. Cf. Coleman v. Miller, 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939); Risser v. Thompson, supra, 930 F.2d at 550-51.) The appellants before us cannot obtain appellate review only because the decree has not done them the type of harm that the law requires as a predicate for mounting a legal challenge, whether in a trial or in an appellate court. They are the wrong appellants.
 
 
 52
 FLAUM, Circuit Judge, concurring in part and dissenting in part. Judge Fairchild and Judge Posner each identify reasons to bar the class members and proposed intervenors from challenging the settlement in this case. Because I believe that certain of the individuals before us can appropriately challenge that settlement, and because I question the process by which that settlement was arrived at, I find myself unable to join either of my colleagues' opinions.
 
 I.
 
 53
 On the question of whether Messrs. Reed and Augenbaugh should have been permitted to intervene under Fed.R.Civ.Pro. 24, I agree with Judge Posner's view that the proper focus on the timing of their intervention looks to the date upon which the proposed settlement was first revealed to the world. See ante at 506-07. Until that date, as Judge Posner notes, these proposed intervenors had little incentive to seek to join this suit, because they believed they could rely on the Illinois Attorney General to defend the statutes challenged by the plaintiffs in this case. I also agree with Judge Posner that Mr. Reed and Mr. Augenbaugh lack standing to assert their claims before this court because they fall outside the range of interests the various Illinois statutes at issue in this case are intended to protect.
 
 
 54
 I differ with both my colleagues, however, on the question of whether Mrs. Greenwood and Mrs. Murphy, who like all other Illinois women of childbearing years are members of the plaintiff class, lack standing to challenge the consent decree. My difference with my brothers is one of characterization: they see the two class members as objecting to the settlement arrived at on the ground that it was too favorable to them. I view them as challenging both the result of the settlement and the process by which that result was reached, a process which, as discussed more fully below, left much to be desired.
 
 
 55
 Rule 23(e) requires district courts to approve a settlement in a class action before the settlement may bind absent class members. See 2 H. Newberg, Class Actions § 11.23 (2d ed. 1985). Particularly in public-law litigation, where consent decrees and settlements often approach the specificity of regulatory codes, various class members may find any number of reasons to challenge the final decree or agreement. Because of the broad range of interests class members may have in the nature and scope of relief a settlement or consent decree provides, I fear that Judge Posner may over-simplify the standing question when he writes that "a member of a class does not have standing to challenge a settlement that favors him in a tangible sense, though it offends him in an ideological sense." Ante at 506-07. Perhaps the objecting class members in this case would not be satisfied with any settlement that continues to permit legal abortion in Illinois, but their appeal, at least in part, focused more narrowly on the question of whether the settlement they contest was arrived at through arms-length negotiations and was approved after a careful examination by the district court.
 
 
 56
 It may well be that plaintiffs who seek to challenge the settlement reached in a class action solely on ideological grounds have no standing. I take the view, however, that any member of a plaintiff class may appeal the settlement of a class action on the ground that the district court's inquiry into the fairness of the settlement was inadequate and that the settlement was therefore impaired. Any other position, it seems to me, mocks the words this court and others have used in advising trial judges of their duty to ensure that consent decrees are "not illegal, a product of collusion, or contrary to the public interest." South v. Rowe, 759 F.2d 610, 613 n. 3 (7th Cir.1985).
 
 
 57
 Our instruction to district courts to ensure that class action settlements and consent decrees are not the product of collusion recognizes that the settlement in a class action, typically arrived at through the active involvement of a small fraction of the class members, may not match the expectations of the plaintiff class as a whole. Our scrutiny of these decrees is thus intended to protect "those who did not participate in negotiating the compromise." United States v. Oregon, 913 F.2d 576, 581 (9th Cir.1990). We remind district courts to scrutinize the legality of settlements and consent decrees and their effect on the public interest because we recognize that, especially in public-law litigation, these effects may reach far beyond even the nominal parties to the suit, let alone those who participated in resolving it. Ironically, however, under Judge Posner's approach it is only those who are satisfied with the settlement who would be able to challenge the fairness of the process that led to its adoption. Those who are dissatisfied with the process, for any reason except that they received "too little," are barred from challenging the fairness of that process on appeal. In practice, of course, those who were involved in the negotiation of a settlement or consent decree will rarely challenge the fairness of a process in which they actively participated. That task will be left to those who for one reason or another are dissatisfied with that process, and perhaps with the outcome it led to as well.
 
 
 58
 The remedy Judge Posner holds out for today's objectors is the possibility of subsequent suits challenging the settlement or consent decree, instituted by parties who later become aggrieved by its terms. In my view, however, we only prolong the injury caused by a consent decree arrived at through an unfair process by failing to invalidate it sooner rather than later. If the decree in this case is, as the objectors allege, the product of inadequate or incomplete representation, the agreement will not increase in legitimacy through the passage of time. Equally important, in approving this decree the district court assumed a continuing duty to monitor the parties' compliance with its terms. In fulfilling this responsibility, the federal courts will be called upon to enforce the result of an arguably flawed process, at least until the day when Judge Posner's hypothetical future challenger materializes. Finally, even those who benefit most from a given consent decree are harmed when courts close their doors to dissatisfied non-participants until some future time, because until the grievances of these non-participants are addressed, the decree remains suspect. Certainly the named plaintiffs and defendants in this case would be happier with a ringing affirmance of the district court's approval of the decree than with Judge Posner's nod to future Illinois attorneys general and legislators.
 
 
 59
 Unlike Judge Posner, I am unwilling to await some future litigant. I would instead preserve the right of appeal for class members who, for one reason or another, believe that the process that led to the adoption of the settlement or decree--which will preclude them from asserting their legal rights in the future, see Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 367, 41 S.Ct. 338, 342, 65 L.Ed. 673 (1921)--was tainted. In some cases they may be right, and an appellate court will be able to prevent an unfair or unlawful settlement or consent decree from taking effect. In all cases we will satisfy the objecting class members that they have received justice rather than leaving them to walk down the courthouse steps feeling twice spurned by the judicial system, first by a settlement reached and approved through inadequate procedures, and second by a rule of standing that denies them the right to challenge that settlement. So long as challenges to the procedure leading to a settlement are brought by class members, appeals courts should remain open to hear them.
 
 
 60
 Because I conclude that two of the four individuals objecting to the fairness of the consent decree arrived at in this case have standing to do so, I turn to the substantive issue presented in this appeal: whether the decree in this case is "fair, reasonable and equitable, and does not violate the law or public policy." Sierra Club v. Elec. Controls Design, 909 F.2d 1350, 1355 (9th Cir.1990). In my view, the district court's examination of the troublesome issues raised by the decree renders us incapable, on this record at least, of answering this question. The district court in this case yielded to the view that consent decrees are essentially contracts between the litigants, with the district court's role limited to "sign[ing] on the line provided by the parties." United States v. Miami, 664 F.2d 435, 441 (5th Cir.1981) (en banc ) (opinion of Rubin, J.). It chose not to examine, in any but the most preliminary fashion, the lawfulness of the decree under the federal constitution or its fidelity to Illinois law and public policy. And it did so despite the unique circumstances that gave rise to the settlement of this suit, circumstances which made a deeper inquiry particularly appropriate.
 
 II.
 
 61
 In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court ruled that "the Fourteenth Amendment's concept of personal liberty ... is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." Id. at 153, 93 S.Ct. at 727. The Court held that, at least in the first trimester, this liberty interest was sufficient to require that if the pregnant woman decided to terminate her pregnancy, "the judgment may be effectuated by an abortion free of interference by the state." Id. at 163, 93 S.Ct. at 732. See also Akron v. Akron Center for Reproductive Health, 462 U.S. 416, 429-430, 103 S.Ct. 2481, 2492, 76 L.Ed.2d 687 (1983). This preference for the woman's liberty interest over the government's interest in regulating abortion was the law when the district court granted a preliminary injunction to the plaintiffs in this case. See Ragsdale v. Turnock, 625 F.Supp. 1212, 1229-30 (N.D.Ill.1985) ("[A]ny regulation, even a general regulation, which burdens a woman's right to choose to terminate her pregnancy during the first trimester would have to meet the compelling governmental interest requirement."). It remained the law when this Court affirmed that decision. See Ragsdale v. Turnock, 841 F.2d 1358, 1368 (7th Cir.1988) ("[W]here first trimester abortions are involved, not only must the impact of the challenged regulation be insignificant in terms of the woman's exercise of her right, but also [ ] the regulation must be justified by important state health objectives."). But it may well have ceased to be the law on July 3, 1989, when the Supreme Court announced its decision in Webster v. Reproductive Health Servs., 492 U.S. 490, 109 S.Ct. 3040.
 
 
 62
 Writing for three members of the Court in Webster, Chief Justice Rehnquist dispensed with the limits Roe placed on first-trimester abortions, observing that he could not see "why the State's interest in protecting potential human life should come into existence only at the point of viability, and that there should therefore be a rigid line allowing state regulation after viability but prohibiting it before viability." 492 U.S. at 519, 109 S.Ct. at 3057. For his part, Justice Scalia explicitly called for Roe to be overruled. Id., 492 U.S. at 532, 537, 109 S.Ct. at 3064, 3067 (Scalia, J., concurring in part and concurring in the judgment). And Justice O'Connor, while foreswearing any desire "to reexamine Roe," 492 U.S. at 526, 109 S.Ct. at 3061 (O'Connor, J., concurring in part and concurring in the judgment), nevertheless voted to uphold a Missouri statute that limited the discretion of physicians in performing abortions in the second trimester for reasons entirely unrelated to the welfare of the mother. As Justice Blackmun pointed out in dissent, this statute would have been unconstitutional under Roe's trimester framework because Roe does not permit regulation "in the interest of potential life ... until the third trimester." Webster, 492 U.S. at 541, 109 S.Ct. at 3069 (Blackmun, J., concurring in part and dissenting in part). See also Roe, 410 U.S. at 164, 93 S.Ct. at 732 (limiting second-trimester regulation to measures "reasonably related to maternal health."); Akron, 462 U.S. at 416, 103 S.Ct. at 2481.
 
 
 63
 Webster is a plurality opinion, and admittedly does not announce Roe's demise. The fact remains, however, that in Webster five members of the Court agreed that the balance Roe struck between a woman's interest in terminating her unwanted pregnancy and the state's interest in ensuring the safety of the abortion procedure and protecting fetal life no longer reflected its interpretation of the Fourteenth Amendment's due process clause. Neither the litigants in this case nor the district court needed to resort to tea leaves to divine that Webster had altered the constitutional landscape upon which this case would be contested if it were allowed to continue in the Supreme Court. Indeed, the Illinois Public Health Director and his codefendants relied on Webster in their brief to the Supreme Court in this case, arguing that, like the Missouri restrictions on abortions in state hospitals upheld in Webster, the sanitary regulations imposed on clinics by the Illinois statutes at issue in this case "do not unduly burden the abortion decision." Brief for Appellant at *29, Turnock v. Ragsdale, No. 88-790, August 31, 1989 (available on LEXIS, GENFED library, BRIEFS file).
 
 
 64
 Nevertheless, when those who objected to the proposed consent decree sought to rely on Webster in contesting the lawfulness of the decree, the district court rejected this argument, summarily labelling it "unavailing" because the precise regulatory measures at issue in Webster were different in kind from the Illinois statutes challenged in this case. Ragsdale v. Turnock, 734 F.Supp. 1457, 1460 (N.D.Ill.1990). Like the district court, Judge Fairchild takes only passing note of Webster's impact on this case, writing in a footnote that he "see[s] nothing" in Webster or more recent abortion decisions that "affect[s] the statutes challenged in this case." Ante at 505, n. 1. Judge Posner's opinion recognizes that the state "might well have won the case in the Supreme Court," ante at 508, tacitly recognizing that the jurisprudence of abortion had, at a minimum, shifted to permit greater state regulation when Webster was handed down.
 
 
 65
 I am unable to agree that the question of Webster's impact on the legal issues in this case could be resolved in the manner adopted by the district court. Though Justice Scalia was moved to write in Webster that the limited scope of the decision would require "the mansion of constitutionalized abortion law ... [to] be disassembled doorjamb by doorjamb," 492 U.S. at 537, 109 S.Ct. at 3067, it is nonetheless true that ever since July 3, 1989, the integrity of that structure has been open to question. The district court's terse rejection of the argument that Webster might be relevant in examining the lawfulness of the proposed consent decree was, in my view, an insufficient response to the questions that decision raises about the lawfulness and consistency with Illinois public policy of the consent decree in this case.
 
 III.
 
 66
 Of course, Webster leaves states like Illinois free to regulate or not regulate abortion, and even, perhaps, to enact statutes embodying precisely the provisions contained in the consent decree the district court approved. Moreover, the fact that the consent decree permits less state regulation of abortion than might be constitutional in the wake of Webster is itself not a reason to reject the decree: a consent decree may provide relief beyond that allowed by the statute under which the plaintiff brought suit. See Firefighters Local 93 v. Cleveland, 478 U.S. 501, 522-23, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986) (consent decree resolving employment discrimination case can provide relief that goes beyond "the limitations Congress placed ... on the power of the federal courts to impose obligations on employers or unions to remedy violations of Title VII...."); Kasper v. Board of Election Comm'rs, 814 F.2d 332, 338 (7th Cir.1987). In this case, however, approving a consent decree that limits the state's power to regulate abortions more than is required by Webster carries with it the risk of enjoining the enforcement of valid Illinois statutes and regulations. Because over-enforcing the due process clause in this case may have led the district court effectively to repeal constitutional state statutes, it had a responsibility, growing out of the duty of federal courts to preserve the allocation of powers between the states and the federal government, to inquire into the possible lawfulness of the challenged state enactments.
 
 
 67
 In entering a consent decree, a district court employs a remedy of the flexibility that has typically characterized equitable relief. See S. Symons, 1 Pomeroy's Equity Jurisprudence (5th ed. 1941), § 109 at 141; Donovan v. Robbins, 752 F.2d 1170, 1176 (7th Cir.1985) (consent decree "virtually by definition will contain equitable provisions"). While federal courts have broad equitable powers, these powers are not unlimited. One restriction on their scope is the concept "that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841 (1935). More recently, the Court restated this proposition in Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), writing there that "[w]here ... the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.' " 423 U.S. at 378, 96 S.Ct. at 607 (quoting Stefanelli v. Minard, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951)).
 
 
 68
 Courts differ on the question of whether the consent of the state to a proposed settlement or decree relieves a district court of its responsibility to inquire into the federalism concerns the decree raises. Compare, e.g., Allen v. Alabama State Bd. of Educ., 816 F.2d 575, 577 (11th Cir.1987) with Kasper, 814 F.2d at 340-41. See generally, Note, Federalism and Federal Consent Decrees Against State Governmental Entities (hereinafter, "Federal Consent Decrees"), 88 Colum.L.Rev. 1796, 1801 & nn. 31-32 (1988) (collecting cases). I believe the better view is the one we took in Kasper: regardless of the state's consent, "[a] federal court must preserve the appropriate relation between state and national power." 814 F.2d at 340. See also Lelsz v. Kavanagh, 807 F.2d 1243, 1253 (5th Cir.1987) (vacating consent decree that created "federal court remedy unfounded in federal law [which] intrudes into the governance of matters otherwise presided over by the state.").[1]
 
 
 69
 When we enjoin the enforcement of a state statute on federal constitutional grounds, the views of democratically elected state legislators are supplanted by those of unelected federal judges. This outcome is warranted when the challenged state statute violates rights guaranteed by the federal constitution or encroaches upon some other aspect of federal law. To my mind, however, "the appropriate relation between state and national power" we instructed district courts to be mindful of in Kasper is one in which federal judges employ their equitable powers to enjoin the enforcement of state statutes only after they have determined that these statutes contain some constitutional deficiency. See General Bldg. Contractors v. Pennsylvania, 458 U.S. 375, 399, 102 S.Ct. 3141, 3154, 73 L.Ed.2d 835 (1982) (federal remedial powers "could be exercised only on the basis of a violation of the law and could extend no farther than required by the nature and extent of the violation."); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15-16, 91 S.Ct. 1267, 1275-76, 28 L.Ed.2d 554 (1971) ("In seeking to define ... how far" equitable power to order school desegregation extends, "it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation."); Jenkins by Agyei v. Missouri, 807 F.2d 657, 666 (8th Cir.1986) (en banc ) ("Federal courts may not invoke their equitable power to fashion a remedy to correct a condition unless it currently offends the constitution."). These cases compel the conclusion that, when a proposed consent decree would enjoin the enforcement of state statutes, a district court evaluating the decree must satisfy itself that these statutes suffer from some infirmity that would allow the court to enjoin them absent the state's agreement.
 
 
 70
 In this case, due regard for the legislative judgment of the people of Illinois required the district court to evaluate, in light of Webster, the constitutionality of the various state statutes governing health facilities and medical practice whose enforcement the decree will bar. The Supreme Court's holding in Firefighters that consent decrees can provide relief beyond what the plaintiffs could have obtained at trial does not obviate the need for this inquiry. Unlike the situation in that case (a Title VII suit against a municipal employer) if the consent decree in this case provides relief beyond that required by the Fourteenth Amendment, it will permanently enjoin the enforcement of state statutes that in no way conflict with any provision of federal law, constitutional or statutory.
 
 
 71
 The statutes enjoined in this decree represent the decisions of the people of Illinois, speaking through their elected representatives. The plaintiffs contend that the legislature's unspoken aim in enacting these provisions was to limit the availability of low-cost clinic abortions. If so, these statutes are consistent with other statements of the popular will in Illinois, most notably the Human Life Act, Ill.Ann.Stat. ch. 38, p 81-21 (Smith-Hurd Supp.1991), which declares "the longstanding policy of this State, that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life," as well as the various statutes Judge Posner relies upon in concluding, see ante at 508, that Illinois regards fetuses as persons. Before approving a decree that upsets these legislative choices, the district court had a duty to explore whether the challenged enactments offend the constitution. So far as the district court's opinion reveals, this inquiry never occurred.
 
 IV.
 
 72
 The district court apparently decided that a deeper inquiry into the lawfulness of the challenged Illinois statutes was unnecessary in part because the consent decree it was called upon to approve was the product of bargaining from which neither side emerged wholly victorious. See Ragsdale, 734 F.Supp. at 1460. The settlement reached by the parties, the district court wrote, had allowed " '[e]ach side [to] gain[ ] the benefit of immediate resolution of the litigation and some measure of vindication for its position while foregoing the opportunity to achieve an unmitigated victory.' " Id. (quoting EEOC v. Hiram Walker & Sons, 768 F.2d 884, 889 (7th Cir.1985)). I agree as a general matter that one factor that might justifiably lead a district court to limit its scrutiny of a proposed consent decree is the fact that "the [ ] decree embodies as much of [the parties'] opposing purposes as the respective parties have the bargaining power and skill to achieve." United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Indeed, adversity between the parties to the negotiations that lead to the proposed decree will tend to ameliorate the federalism concerns discussed above, because when the state believes it will win on the question of the constitutionality of a state statute should the case go to trial, it has little incentive to enter into a consent decree enjoining the statute's enforcement.
 
 
 73
 This assumes, however, that the persons negotiating for the state set as their goal the enforcement of the will of the state's legislators, and by extension, the people who put them in office. Students of the use of consent decrees in public-interest litigation have noted, however, that the assumption that state defendants entering into a decree represent all the state's interests in the litigation is frequently mistaken. Rather, it is not uncommon for consent decrees to be entered into on terms favorable to those challenging governmental action because of rifts within the bureaucracy or between the executive and legislative branches. See, e.g., Horowitz, Decreeing Organizational Change: Judicial Supervision of Public Institutions, 1983 Duke L.J. 1265, 1292, 1294-95 (1983) (discussing phenomenon of "[n]ominal defendants [who] are sometimes happy to be sued and happier still to lose."); see also Easterbrook, Justice and Contract in Consent Judgments, 1987 U.Chi.L.Forum 19, 30-37 (1987); McConnell, Why Hold Elections? Using Consent Decrees to Insulate Policies From Political Change, 1987 U.Chi.L.Forum 295, 301 (noting that "one of the evils to be guarded against is the collusive settlement--government lawyers settling a suit on favorable terms to the opposing party precisely because they expect that successive administrations may be less sympathetic to its cause."); Federal Consent Decrees at 1805-06. Courts, too, have been alert to the possibility that state defendants in public-interest litigation may have interests that depart from those of the government they serve. See Rhodes v. Chapman, 452 U.S. 337, 360, 101 S.Ct. 2392, 2406, 69 L.Ed.2d 59 (1981) (Brennan, J., concurring) (noting that "[e]ven prison officials have acknowledged that judicial intervention has helped them to obtain support for needed reform."); Kasper, 814 F.2d at 340 ("district judges should be on the lookout for attempts to use consent decrees to make end runs around the legislature...."); Dunn v. Carey, 808 F.2d 555, 560 (7th Cir.1986) ("A court must be alert to the possibility that a consent decree is a ploy in some other struggle.").
 
 
 74
 When confronted with allegations that a government agent with control over the decision to negotiate and enter into a consent decree may have interests that differ from those of other segments of the government, a district judge's scrutiny of the decree must necessarily increase. One can accept Judge Posner's statement that "the separation of powers within state government" is not "a proper matter of federal judicial concern," ante at 510, but still conclude that the choice of which private agreements merit the approval--and continuing enforcement power--of a federal court is a matter of federal judicial concern. See Kasper, 814 F.2d at 340-341. One circumstance that might give a federal district court pause as it decides whether to approve the parties' proposed decree is a charge that the officer who negotiated the decree on the state's behalf had "shattered" any expectation that he or she would vigorously defend state statutes. See ante at 507 (Posner, J., concurring). This is nothing more than a specific example of the heightened scrutiny this Court employs in passing upon settlements in which it appears that the interests of the litigants are in danger of being sacrificed for the benefit of their lawyers. See, e.g., Armstrong v. Board of School Directors, 616 F.2d 305, 313 (7th Cir.1980) (discussing risk that "class counsel may be persuaded by the prospect of a substantial fee to accept a settlement proposal which leaves the class with less relief than could have been procured through more vigorous negotiation."); Hiram Walker & Sons, 768 F.2d at 890-91 (heightened scrutiny of consent decree appropriate where there is an allegation that "the attorneys involved have sacrificed their clients' interests to assure themselves of receiving sizable attorneys' fees.").
 
 
 75
 The alleged conflict of interest in this case was of a different sort. According to those who objected to the settlement, the Illinois Attorney General, who on behalf of the defendants directed the course of this litigation and the negotiations that led to the proposed decree, had "failed to defend the statutes and regulations which constitute the body of Illinois law" by agreeing to a decree more favorable to the plaintiffs than they would have received had the case proceeded in the Supreme Court. Fairness Hearing Transcript at 48. See also id. at 57, 83. These allegations were accompanied by news accounts in which both critics and supporters of the settlement speculated that the Attorney General had been eager to resolve this dispute because it had become politically disadvantageous to allow the high court to decide it. See, e.g., Karwath & Brotman, Illinois Abortion Case Settled, Chicago Tribune, Nov. 23, 1989 at 1.
 
 
 76
 Knowing of these allegations, the district court had a "fiduciary duty" to the litigants, Stewart v. General Motors, 756 F.2d 1285, 1293 (7th Cir.1985), to examine carefully the proposed consent decree to insure that the state had not paid too high a price for a settlement which, as Judge Posner writes, "preserves very little" of the challenged statutes. Ante at 507. Webster made the need for this inquiry particularly acute: by improving the state's chances in the Supreme Court, it heightened concerns as to what prompted its chief legal officer to forego an opportunity to have the legislature's decision to regulate abortion vindicated. According to the objectors, in the wake of Webster the state's choice to agree to a settlement on terms highly favorable to the plaintiffs began to look like the kind of agreement that arms-length bargaining would not have produced.
 
 
 77
 Despite this contention, nothing in the district court's opinion suggests that it examined the proposed decree to determine whether it reflected the product of bargaining between genuinely adverse parties, that it was, in other words, within the range of fair settlements. Rather, the district court relied on the purported adversity between the Attorney General and the named plaintiffs, despite allegations that their interests at the time they negotiated the decree were not materially opposed. In fairness to both the Attorney General and the objectors, a more comprehensive inquiry could have addressed these allegations.
 
 V.
 
 78
 As we wrote in Donovan v. Robbins, 752 F.2d 1170 (7th Cir.1985), "how deeply the [district] judge must inquire" into the fairness of a proposed consent decree, "what factors he must take into account, and what weight he should give the settling parties' desires will vary with the circumstances." Id. at 1177. In this case, the district court was faced with a changing body of law concerning permissible regulation of abortion and a state officer whose motivations in settling this case were questioned at the fairness hearing and elsewhere. These circumstances demanded a more searching examination of the fairness of the consent decree the parties arrived at than the district court provided. I respectfully dissent.
 
 
 
 [1]
 We see nothing in recent Supreme Court opinions thought to limit the doctrine of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), affecting the statutes challenged in this case. Rust v. Sullivan, --- U.S. ----, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (government may constitutionally prohibit dissemination of information concerning abortion at clinics which accept government funds); Hodgson v. Minnesota, --- U.S. ----, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (parental notification statute partially constitutional and partially unconstitutional); Ohio v. Akron Central for Reproductive Health, --- U.S. ----, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (parental notification statute constitutional); Webster v. Reproductive Health Services, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (restriction on abortions in public facilities and viability testing requirement are constitutional)
 
 
 [1]
 Indeed, Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), may well compel the view that the state's consent to a decree does not eliminate the limits federalism imposes on the district court's power to enter the decree. Though Rizzo involved an injunction rather than a consent decree, the remedy adopted by the district court "resembled a consent decree in several respects." Federal Consent Decrees at 1804 n. 48. The defendants in COPPAR v. Tate, the district court action reviewed in Rizzo, played a significant role in drafting portions of the injunction, see 60 F.R.D. 615, 616 (E.D.Pa.1973), and as Justice Blackmun observed in his Rizzo dissent, "[t]he remedy was one evolved with the defendant officials' consent, and it was one that the police department concededly could live with." 423 U.S. at 381, 96 S.Ct. at 609 (Blackmun, J., dissenting)